## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

RECEIVED

2020 FEB 24 P 2: 20

DEBRA P. HACKETT, CLK.
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| **BETTY HEAD as Administrator** §<br>**of the Estate of BILLY LEE THORNTON, Jr.,** §<br>**Deceased; JEFFERY RUST as Administrator** §<br>**of the Estate of RYAN RUST, Deceased;** §<br>**THERESA HOLMES, as Administrator of the** §<br>**Estate of MATTHEW HOLMES, Deceased;** §<br>**and JERI FORD, as Administrator of the** §<br>**Estate of PAUL FORD, Deceased,** §<br> §<br>**Plaintiff,** §<br> §<br>**v.** §<br> §<br>**JEFFERSON DUNN; RUTH NAGLICH;** §<br>**CYNTHIA STEWART; BRADRICK FILES;** §<br>**JIMMY PATRICK; WARDEN DOE I; LEON** §<br>**BOLLING; MHM CORRECTIONAL** §<br>**SERVICES, INC., a.k.a. MHM** §<br>**CORRECTIONAL SERVICES, LLC, a.k.a.** §<br>**MHM HEALTH PROFESSIONALS, INC.,** §<br>**a.k.a. MHM HEALTH PROFESSIONALS,** §<br>**LLC; WEXFORD HEALTH SOURCES,** §<br>**INC.; and JOHN DOES I- XVI,** §<br> §<br>**Defendants.** § | **No.: 2:20 cv -132 -**<br><br>***PLAINTIFFS DEMAND***<br>***A JURY TRIAL*** |

## <u>COMPLAINT AT LAW</u>

NOW COME the Plaintiffs, BETTY HEAD, as Administratrix of the Estate of Billy

Thornton, Deceased; JEFFERY RUST as Administrator of the Estate of RYAN RUST,

Deceased; THERESA HOLMES, as Administratrix of the Estate of MATTHEW HOLMES,

Deceased, and JERI FORD, as Administratrix of the Estate of PAUL FORD, Deceased, by

and through their attorneys, and for Plaintiff's Complaint at Law against Defendants

JEFFERSON DUNN, RUTH NAGLICH, CYNTHIA STEWART, BRADRICK FILES,

JIMMY PATRICK, LEON BOLLING, WARDEN DOE I, MHM CORRECTIONAL

1

SERVICES, INC., WEXFORD HEALTH SOURCES, INC., and, JOHN DOES I-XVI, pleading hypothetically and in the alternative, states as follows:

## JURY DEMAND

1.   Plaintiffs hereby demand a trial by jury on each and every count plead in this instant Complaint at Law.

## JURISDICTION AND VENUE

2.   This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331 and over deprivations of constitutional rights pursuant to 28 U.S.C. §1343.

3.   Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the state law claims, since these claims are so related to the claims in the §1983 action that they form part of the same case and controversy.

4.   Venue is proper in this Court under 28 U.S.C. §1391(b) because all defendants are residents of the state of Alabama, and multiple defendants reside in the Middle District of Alabama. Moreover, a substantial part of the events giving rise to this action occurred in the Middle District of Alabama.

## THE PARTIES

5.   At all relevant times, Plaintiff BETTY HEAD, the mother of decedent Billy Lee Thornton, Jr., was a citizen of the United States and a resident of Tuscaloosa, Alabama.

6.   Plaintiff BETTY HEAD is the Administrator of the estate of her deceased son, Billy Thornton.

7.   At the time of his death, Billy Thornton was a citizen of the United States and a resident of Escambia County, Alabama.

8.     At all relevant times, Plaintiff JEFFERY RUST, the father of decedent Ryan Rust, was a citizen of the United States and a resident of Daphne, Alabama.

9.     Plaintiff JEFF RUST is the Administrator of the estate of his deceased son, Ryan Rust.

10.    At the time of his death, Ryan Rust was a citizen of the United States and a resident of Escambia County, Alabama.

11.    At all relevant times, Plaintiff THERESA HOLMES, the mother of decedent Matthew Holmes, was a citizen of the United States and a resident of Smiths Station, Alabama.

12.    Plaintiff THERESA HOLMES is the Administrator of the estate of her deceased son, Matthew Holmes.

13.    At the time of his death, Matthew Holmes was a citizen of the United States and a resident of Limestone County, Alabama.

14.    At all relevant times, Plaintiff JERI FORD, the life partner of decedent Paul Ford, was a citizen of the United States and a resident of Talladega.

15.    Plaintiff JERI FORD is the Administrator of the estate of her deceased life partner, Paul Ford.

16.    At the time of his death, Paul Ford was a citizen of the United States and a resident of Montgomery County, Alabama.

17.    At all relevant times, Defendant JEFFERSON DUNN ("Dunn"), sued in his individual capacity, was the Commissioner of the Alabama Department of Corrections ("ADOC").

3

18.    At all relevant times[NW1], Defendant RUTH NAGLICH ("Naglich") sued in her individual capacity, was the Associate Commissioner of Health Services of the Alabama Department of Corrections ("ADOC").

19.    At all relevant times, Defendant, CYNTHIA STEWART ("Stewart"), sued in her individual capacity, was the Warden of Alabama's William C. Holman Correctional Facility ("Holman"), located in Escambia County, Alabama.

20.    As warden of the Holman Correctional Facility, Warden STEWART was responsible for the daily functioning and administration of Holman, including the safe, secure, and humane treatment of all prisoners incarcerated there.

21.    At all relevant times, Defendant, BRADRICK FILES ("Files"), sued in his individual capacity, was a Warden of Limestone Correctional Facility, located in Harvest, County of Limestone, Alabama.

22.    As a warden of the Limestone Correctional Facility, Warden FILES was responsible for the daily functioning and administration of Limestone, including the safe, secure, and humane treatment of all prisoners incarcerated there.

23.    At all relevant times, Defendant, JIMMY PATRICK ("Patrick"), sued in his individual capacity, was a Warden of Limestone Correctional Facility, located in Harvest, County of Limestone, Alabama.

24.    As a warden of the Limestone Correctional Facility, Warden PATRICK was responsible for the daily functioning and administration of Limestone, including the safe, secure, and humane treatment of all prisoners incarcerated there.

25.    At all relevant times, Defendant, WARDEN DOE I ("Warden Doe I"), sued in his individual capacity, was a Warden of Limestone Correctional Facility, located in Harvest, County of Limestone, Alabama.

26.    As a warden of the Limestone Correctional Facility, WARDEN DOE I was responsible for the daily functioning and administration of Limestone, including the safe, secure, and humane treatment of all prisoners incarcerated there.

27.    At all relevant times, Defendant, LEON BOLLING ("Bolling"), sued in his individual capacity, was the Warden of Alabama's Kilby Correctional Facility.

28.    As warden of the Kilby Correctional Facility, Warden BOLLING was responsible for the daily functioning and administration of Kilby, including the safe, secure, and humane treatment of all prisoners incarcerated there.

29.    At all relevant times, Defendants JOHN DOE I, II, III, and IV were correctional officers, employed by Holman Correctional Facility by and through Warden STEWART.

30.    At all relevant times, when Defendants JOHN DOE I, II, III, and IV were engaging in the complained of conduct herein, they were acting under color of law and in the course of their employment as Holman correctional officers.

31.    At all relevant times, Defendants JOHN DOE V and VI were correctional officers, employed by Limestone Correctional Facility by and through Warden FILES, and/or PATRICK, and/or WARDEN DOE I.

32.    At all relevant times, when Defendants JOHN DOE V and VI were engaging in the complained of conduct herein, they were acting under color of law and in the course of their employment as Limestone correctional officers.

33.     At all relevant times, Defendants JOHN DOE VII and VIII were correctional officers, employed by Kilby Correctional Facility by and through Warden BOLLING.

34.     At all relevant times, when Defendants JOHN DOE VII and VIII were engaging in the complained of conduct herein, they were acting under color of law and in the course of their employment as Kilby correctional officers.

35.     At all relevant times, Defendant MHM CORRECTIONAL SERVICES, INC. ("MHM") was a corporation licensed and organized under the laws of the state of Virginia.

36.     At all relevant times, Defendant MHM operated a registered office located in the city of Montgomery, County of Montgomery, Alabama.

37.     At all relevant times, Defendant WEXFORD HEALTH SOURCES, INC. ("Wexford) was a corporation licensed and organized under the laws of the state of Florida.

38.     At all relevant times, Defendant WEXFORD operated a registered office located in the city of Montgomery, County of Montgomery, Alabama.

39.     At all relevant times until mid-2018, Defendant MHM contracted with the Alabama Department of Corrections, the Holman, Limestone, and Kilby Correctional Facilities, and Wardens STEWART, FILES, PATRICK, WARDEN DOE I, and BOLLING, to administer, refer, and approve medical care and treatment for inmates in the custody of Wardens STEWART, FILES, PATRICK, WARDEN DOE I, and BOLLING and the Holman, Limestone, and Kilby Correctional Facilities.

40.     Defendants JOHN DOE IX and X were, at all relevant times, employees and/or agents of Defendant MHM, and at all times were acting within the course and scope of their employment.

6

41.     At all relevant times from mid-2018 to the present, Defendant WEXFORD contracted with the Alabama Department of Corrections, the Holman, Limestone, and Kilby Correctional Facilities, and Wardens STEWART, FILES, PATRICK, WARDEN DOE I, and BOLLING to administer, refer, and approve medical care and treatment for inmates in the custody of Wardens STEWART, FILES, PATRICK, WARDEN DOE I, and BOLLING, and the Holman, Limestone, and Kilby Correctional Facilities.

42.     Defendants JOHN DOE XI, XII, XIII, XIV, XV, and XVI were, at all relevant times, employees and/or agents of Defendant WEXFORD, and at all times were acting within the course and scope of their employment.

## FACTS COMMON TO ALL COUNTS[1]

### A.  Alabama Department of Corrections Mental Health Care Structure

43.     At all relevant times, Defendant Dunn served as the Commissioner of the Alabama Department of Corrections, overseeing the Department's vital functions, including prisoner treatment.

44.     At all relevant times, [NW2]Defendant Naglich served as ADOC's Associate Commissioner for Health Services, heading the Office of Health Services ("OHS"), which is responsible for overseeing the provision of both medical and mental-health care to prisoners.

45.     Until mid-2018, Defendant MHM was ADOC's contractor for mental health care.

---

[1] Counsel for Plaintiffs are developing a record and analyzing prevailing legal precedent regarding a potential damages-class certification. Plaintiffs reserve the right to move the Court to certify a damages class at the appropriate time, if at all.

46.     From mid-2018 to the present, Defendant Wexford was ADOC's contractor for mental health care.

47.     At all relevant times, under the mental-health contracts between ADOC's Office of Health Services and MHM, followed by WEXFORD, OHS had access to MHM and WEXFORD's internal documents and records, and MHM and WEXFORD were obligated to send reports, like monthly operating reports and annual contract compliance reports, to the Office of Health Services.

48.     At all relevant times, Defendant Naglich was in charge of contract monitoring and exercising oversight of MHM's and WEXFORD's provision of services.

## B. Failures by the Alabama Department of Corrections to Provide Adequate Mental Health Care to Inmates

49.     In June 2017, the Middle District of Alabama issued a liability opinion in the *Braggs v. Dunn* litigation in which it found that ADOC's mental-health care for prisoners in its custody was "[simply put...horrendously inadequate" and violated the Eighth Amendment. *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. June 27, 2017).

50.     More specifically, the Middle District of Alabama found that "ADOC's inadequate crisis care and long-term suicide-prevention measures have created a substantial risk of serious harm, including self-harm, suicide, and continued pain and suffering." *Id.* at 1220.

51.     The serious deficiencies identified by the Court included ADOC's failure to properly identify and classify prisoners with mental illness, inadequate treatment panning, inadequate psychotherapy, failure to provide crisis care to those who needed it, placement of prisoners in crisis in dangerous and harmful settings, including unsafe crisis cells, inadequate monitoring of suicidal prisoners; inappropriate release of prisoners from suicide watch,

inappropriate use of disciplinary actions for symptoms of mental illness, inappropriate use of segregation for mentally ill prisoners, and inadequate follow-up care for prisoners released from suicide watch. *Id.*, at 1218-31.

52.     The Court found that these risks are particularly heightened for prisoners with "serious mental illness," (SMI), "a subset of particularly disabling conditions...defined by the diagnosis, duration, and severity of the symptoms," including conditions like schizophrenia, bipolar disorder, and major depressive disorder. *Id.* at 1186 n. 6, 1246.

### a. Contributing Conditions to Severe Mental Health Treatment Inadequacy

53.     At all relevant times, ADOC experienced high rates of inmate overcrowding, with occupancy rates of up to 175% of the population that its facilities were designed to hold.

54.     MHM, ADOC's mental health provider, had been severely understaffed since 2013 and remained understaffed at the time of Billy Thornton's suicide attempts and ultimate death.

55.     WEXFORD was understaffed at the time of the suicide attempts and deaths of Ryan Rust, Matthew Holmes, and Paul Ford.

56.     MHM and WEXFORD's mental-health caseload per provider has steadily increased since 2003, due to an increasing number of prisoners with mental health needs, and increased severity of prisoner mental-health needs, multiple budget cuts over the years, and a stagnant number of authorized mental health staff positions.

57.     Between 2008 and 2016, the mental-health caseload increased by 25% across all ADOC facilities.

58.     Since 2008, MHM repeatedly requested an increase from Defendants Naglich and Dunn of authorized mental health staff positions—a request defendants Naglich and Dunn refused.

59.     In 2009, Defendants Naglich and Dunn failed to implement a planned initiative to transfer some of MHM's lower-acuity mental health caseload to ADOC staff.

60.     Since at least 2003, ADOC has not had a sufficient number of mental-health staff for a system its size.

61.     At all relevant times, the combination of overcrowding and understaffing taxed MHM's, WEXFORD's, and ADOC's ability to provide adequate mental health care to severely mentally ill individuals, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford through:

       a.  Reduced ability to identify mental illness at intake and referrals;

       b.  Missed counseling appointments and group sessions; and

       c.  Inadequate monitoring of prisoners in mental-health crises.

62.     In 2010, ADOC issued a report noting that correctional staffing fell well short of the required levels, with shortage rates of 12% at close-custody facilities and as high as 21.2% at medium security facilities.

63.     This same statement appeared in nearly each annual ADOC report until 2013.

64.     In 2013, ADOC reported correctional officer shortage rates across facilities at 43.3%.

65.     In 2015, ADOC reported that shortage rates among its facilities was as high as 68%, with only one of its fifteen prisons (Hamilton Aged and Infirm Center) having a shortage rate of less than 25%.

66.     ADOC reported in September of 2016 that it had filled only about half of its authorized positions for correctional officers; the staffing level continued to drop throughout 2016.

67.     At all relevant times, correctional officers were needed to provide security for mental-health programming and escort prisoners from their cells to appointments if they are not in the general population.

68.     At all relevant times, insufficient correctional staffing led to mental health appointments and group activities being cancelled, impairing treatment for severely mentally ill individuals.

69.     At all relevant time, insufficient correctional staffing compromised available correctional officers' abilities to respond to incidents, crises, and emergencies.

70.     At all relevant times, insufficient correctional staffing had a pronounced effect on individuals in segregation and crisis cells, as officers were unable to check on isolated prisoners frequently enough to guarantee their safety.

71.     At all relevant times, mentally decompensating prisoners frequently went unnoticed, leading to a delay in access of treatment and more frequent crises.

### b.   Poor Identification and Classification of Prisoners' Mental Health Needs

72.     At all relevant times, ADOC had one of the lowest mental-illness prevalence rates among correctional systems in the country, because substantial numbers of prisoners with mental illness are missed at intake, and referrals for evaluation are neglected.

73.     At all relevant times, all male ADOC inmates are screened for mental health concerns at Kilby Correctional Facility.

11

74.     At all relevant times, mental health screening for prisoners at intake at Kilby is conducted by licensed practical nurses ("LPNs") with limited mental health training, who go unsupervised by higher-level providers.

75.     At all relevant times, intake forms LPNs filled out included questions that require clinical assessments that LPNs are not qualified to make.

76.     At all relevant times, MHM and WEXFORD staffing was insufficient for the mental-health screenings conducted at Kilby.

77.     At all relevant times, because of insufficient staffing, MHM and WEXFORD frequently sent prisoners to other facilities without conducting an initial mental health intake screening.

78.     At all relevant times, this failure of identification increased the risk of continued emotional and mental suffering and potential suicide among seriously mentally ill inmates.

79.     Moreover, at all relevant times, ADOC had no system to triage and identify the urgency of mental health treatment requests, or to make referrals according to the level of urgency of the request.

80.     MHM's contract-compliance reports noted annually from 2010 to 2016 that processed referral slips for mental health treatment did not reflect acuity levels, and the logs of referrals did not record relevant date and time information, making it impossible to ensure timely processing.

81.     At all relevant times, ADOC had no system of tracking and processing referrals to ensure urgent requests are passed on to providers, or that providers handle referrals in a timely manner.

12

82.     At all relevant times, severe overcrowding and understaffing made it difficult for correctional officers to notice changes in inmate behavior that might indicate a need for mental health treatment.

83.     At all relevant times, Defendants were aware that prisoners often engaged in self-harm or destructive behavior to gain the attention of mental-health staff and get needed treatment, including self-injury, fire-setting, and suicide attempts.

84.     At all relevant times, ADOC's system of coding the level of functioning of a mental health treatment failed to accurately reflect prisoners' mental health needs.

85.     At all relevant times, ADOC inadequately referred prisoners to residential treatment unit beds and failed to provide residential level care to prisoners who required it.

86.     At all relevant time, available residential treatment unit beds remained unoccupied, which was noted for years in MHM's monthly operating reports prior to Billy Thornton's death.

### c.  Inadequate Treatment Planning

87.     At all relevant times, ADOC's treatment plans for severely mentally ill prisoners were not individualized to each prisoner's symptoms and needs.

88.     At all relevant times, treatment plans for severely mentally ill prisoners did not change to account for changes in the prisoner's mental health state.

89.     At all relevant times, treatment plans for severely mentally ill prisoners did not reflect changes in prisoner's environment, like moves to segregation or crisis watch.

90.     At all relevant times, treatment team meetings at facilities happened infrequently, with key members of the team missing or failing to participate.

91. At all relevant times, treatment team meetings occurred without the participation of a provider with expertise in psychotropic medication.

92. At all relevant times, transfers of prisoners between facilities was frequent within ADOC.

93. At all relevant times, the generic nature of treatment plans required new counselors to create treatment plans with inadequate information following a prisoner transfer, resulting in inconsistent treatment.

94. These failures subjected mentally ill prisoners to a high risk of exacerbated symptoms and serious injury from self-harm.

95. At all relevant times, Defendants were aware of these failures and of the risks posed to seriously mentally ill inmates, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, by these failures.

### d. Inadequate Psychotherapy

96. At all relevant times, Defendants were aware that psychotherapy was essential for the treatment of mental illness.

97. As a result of overcrowding and understaffing, the frequency and quality of counseling sessions for seriously mentally ill prisoners decreased steadily since the early 2000s.

98. At all relevant times, at some ADOC facilities, MHM and WEXFORD counselors had caseloads twice as high as what they should have been.

99. At all relevant times, as a result of overcrowding and understaffing, individual counseling appointments and group therapy sessions were frequently delayed or cancelled.

14

100.     At all relevant times, as a result of overcrowding and understaffing, counseling sessions with seriously mentally ill prisoners were often cursory and did not reflect clinical judgements or adequately assess patient progress.

101.     At all relevant times, these problems were particularly acute for prisoners in segregation, because inmates in segregation must be escorted from their cells by correctional officers.

102.     At all relevant times, mental health contacts were often conducted cell-side; however, these contacts were insufficient as counseling and did not constitute mental health treatment.

103.     At all relevant times, despite ADOC's contract with MHM stating that all mental health professionals must be licensed, only a small percentage of mental health professionals practicing in ADOC held licensure.

104.     At all relevant times, unlicensed mental health professionals practicing within ADOC went unsupervised by licensed psychologists, despite state regulations requiring such oversight.

105.     These failures subjected seriously mentally ill prisoners to a high risk of exacerbated symptoms and serious injury from self-harm.

106.     At all relevant times, Defendants were aware of these failures and of the risks posed to seriously mentally ill inmates, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, by these failures.

### e.  Inadequate Inpatient Care

107.     At all relevant times, ADOC and its wardens, including Wardens STEWART, FILES, PATRICK, WARDEN DOE I, and BOLLING, often placed segregation inmates

15

without mental health needs into mental-health units, allowing inmates without severe mental illness to use beds that should have been used for providing treatment for those with severe mental illness.

108.   MHM noted annually to ADOC from 2012 to 2016 that this practice was ongoing and was negatively impacting MHM's ability to provide appropriate treatment of severely mentally ill prisoners.

109.   Defendants were aware at all relevant times that out-of-cell time was vital for treatment of patients with severe mental illness.

110.   At all relevant times, Defendants were aware that in prison systems around the country, the standard out-of-cell time for individuals in mental-health units is twenty hours per week.

111.   At all relevant times, Defendants were aware that severely mentally ill inmates, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, often received only five hours per week of out-of-cell time.

112.   Nonetheless, at all relevant times, severely mentally ill prisoners, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, received very little out-of-cell time, spending virtually all day inside their cells.

113.   At all relevant times, ADOC maintained and carried out policies that limited the possessions of severely mentally ill individuals, meaning that these individuals, including Billy Thornton, had few options to keep them engaged.

114.   At all relevant times, Defendants recognized that hospitals were able to provide a higher level of monitoring and treatment for severely mentally ill and suicidal patients than what ADOC and MHM could provide.

115.    At all relevant times, despite administrative regulations stating that individuals who spend more than 30 days in a stabilization unit should be considered for psychiatric hospitalizations, ADOC seldom provided these transfers to prisoners.

116.    These failures subjected seriously mentally ill prisoners to a high risk of exacerbated symptoms and serious injury from self-harm.

117.    At all relevant times, Defendants were aware of these failures and of the risks posed to seriously mentally ill inmates, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, by these failures.

### f.  Inadequate Suicide Prevention and Crisis Care

118.    Defendants were aware that inmate suicide risk increases in correctional facilities with crowding, low staffing rates, and frequent inmate transfers.

119.    At all relevant times, correctional officers and mental health staff had the ability to place any prisoner on suicide watch.

120.    At all relevant times, a mid- or high-level provider was required to conduct a mental health assessment, including the use of a suicide risk assessment tool.

121.    At all relevant times, a prisoner in crisis could alternatively be placed in a crisis cell on "mental health observation," a short-term monitoring status for patients with less acute conditions than those on suicide watch, or patients recently released from suicide watch.

122.    At all relevant times, ADOC, MHM, and WEXFORD rarely used a suicide-risk assessment tool when prisoners threatened suicide, engaged in self-harm, or were placed in crisis cells, thus failing to identify prisoners at an elevated risk of suicide.

123.    At all relevant times, prisoners on suicide watch were frequently kept in crisis cells for more than 72 hours, despite regulations urging that individuals on suicide watch for more than 72 hours should be considered for mental-health placement.

124.    At all relevant times, ADOC had an insufficient number of crisis cells at all facilities for the number of inmates.

125.    Defendants were aware that ADOC's suicide rate multiplied sevenfold from 2013 to 2016, with a suicide rate of more than double the national average in other state and federal correction systems.

126.    Defendant Naglich and MHM managers agreed at trial in the *Braggs* matter that ADOC's number of crisis cells in each of ADOC's 15 institution was insufficient to support their mental health needs.

127.    At all relevant times, due to a shortage of crisis cells, suicidal prisoners were often transferred from their home institution to crisis cells at different institutions.

128.    Defendants were aware that the aforementioned transfer system exacerbated correctional officer shortages, jeopardized prisoner mental states, and interferes with the continuity of care.

129.    At all relevant times, severely mentally ill and suicidal inmates, including Billy Thornton, did not receive necessary and consistent out-of-cell appointments with mental health counselors.

130.    At all relevant times, the vast majority of inmate suicides in ADOC custody were accomplished by hanging.

131.    At all relevant times, a significant number of segregation or crisis cells occupied by severely mentally ill individuals in ADOC custody had easily accessible tie-off

18

points on which an inmate could hang themselves, including sprinkler heads, hinges, fixtures, and vents.

132.   From 2011 to 2016, MHM's contract-compliance reports to ADOC noted that crisis cells in ADOC facilities were unsafe for suicidal inmates.

133.   At all relevant times, ADOC's administrative regulations and the applicable jurisdictional standard of care for mental health care in prisons require that suicide watch should take place at random or otherwise staggered intervals of roughly fifteen minutes.

134.   At all relevant times, ADOC's administrative regulations and the applicable jurisdictional standard of care for mental health care in prisons require that, for prisoners on mental health observations, checks should occur at staggered or otherwise random intervals of roughly thirty minutes.

135.   At all relevant times, despite these regulations, ADOC correctional officers and MHM and WEXFORD mental health specialists performed suicide watch and mental health observation checks at pre-ordained times, without staggering intervals, or otherwise did not perform checks at these intervals.

136.   At all relevant times, the standard of care dictated by the NCCHC, which for mental health care for the most severely acutely suicidal prisoners, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, required constant supervision by correctional officers or mental health providers.

137.   At all relevant times, MHM and WEXFORD were contractually obligated to follow all NCCHC standards.

138.   At all relevant times, Defendants were aware that suicidal prisoners should be released from suicide watch only with the approval of a psychiatrist or nurse practitioner who

has made a face-to-face assessment and confirm that the inmate's condition is stable enough for release to be appropriate.

139.    In 2016, MHM reported to ADOC that suicidal inmates were being discharged from suicide watch without face-to-face-assessments.

140.    In 2016, MHM reported to ADOC that suicidal inmates were being discharged from suicide watch based on information communicated from low-level mental health staff to on-call doctors and nurse practitioners.

141.    These practices continued after WEXFORD became ADOC's primary provider of mental health care.

142.    Defendants were aware at all relevant times that release from suicide watch without the authorization of a psychiatrist or nurse practitioner increased the risk of premature release from suicide watch, which in turn increased the risk of self-harm to severely mentally ill and suicide prisoners, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford.

143.    Defendants were aware at all relevant times that release from suicide watch was necessary to stabilize and improve the mental health of severely mentally ill prisoners, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, and that failure to provide this care created substantial risk that self-injurious or suicidal behavior would continue.

### g. Inappropriate Use of Disciplinary Actions

144.    At all relevant times ADOC, MHM, and WEXFORD maintained a written policy indicating that severely mentally ill prisoners would not be punished for symptoms of a mental illness, including self-harm.

145.   Notwithstanding this policy, at all relevant times, a significant number of severely mentally ill ADOC prisoners were disciplined for behavior stemming from known mental illness, including self-injurious behavior.

146.   Defendants were aware that such practices increased the risk of decompensation in severely mentally ill prisoners and caused needless emotional suffering.

147.   Defendants were aware at all relevant times that desperate acts of self-harm by severely mentally ill prisoners, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, often resulted in discipline or placement in segregation.

### h.  Inappropriate Placement and Inadequate Treatment in Segregation

148.   At all relevant times, all ADOC facilities utilized segregation housing, also referred to as "restrictive housing" or "solitary confinement."

149.   At all relevant times, segregation at all ADOC facilities consisted of the practice of keeping prisoners in single-person cells for approximately 22.5 hours per day, allowing inmates out only to bathe and for brief recreation.

150.   Defendants were aware at all relevant times that the isolation and lack of mental stimulation of the segregation experience has a strong, negative impact on mental health, and that this effect is more pronounced in individuals with severe mental illness.

151.   Defendants were aware at all relevant times that inmates with severe mental illness were highly likely to decompensate when placed in segregation.

152.   At all relevant times, Defendants were aware that the overwhelming consensus in the field of psychology establishes that prisoners with serious mental health needs should never be placed in segregation.

153.    At all relevant times, overcrowding and understaffing issues described herein caused a decrease in the amount and quality of the mental health treatment to individuals placed in segregation.

154.    At all relevant times, mental health providers at ADOC facilities experienced difficulty observing inmates in segregation, and in turn experienced difficulty detecting decompensation and exacerbation of symptoms of mental illness.

155.    At all relevant times, ADOC had no system in place to assess the mental health needs of severely mentally ill inmates to determine if segregation was appropriate.

156.    At all relevant times, even where mental health evaluation revealed that a severely mentally ill inmate in segregation as decompensating, Defendants Dunn, Naglich, Stewart, Files, Patrick, Warden Doe I, and Bolling imposed no internal requirements that its correctional officers or mental health staff remove a prisoner from segregation.

157.    At all relevant times, while only 14% of the ADOC population was identified as having mental health needs, mentally ill prisoners made up 21% of the population in segregation.

158.    At all relevant times, inmates in segregation, even severely mentally ill inmates, including Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, had less access to mental health treatment than inmates not housed in segregation.

159.    Despite requirements within ADOC that they occur at least twice per week, segregation rounds, or periods during which mental health staff travel to segregation cells to assess the needs of inmates in segregation, occurred at all relevant times at all ADOC facilities rarely, if at all.

160.    At all relevant times, the vast majority of successful suicide attempts in ADOC facilities occurred in segregation units.

161.    In 2017, the *Braggs* court held explicitly that:

> it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances; even in extenuating circumstances, decisions regarding the placement should be with the involvement and approval of appropriate mental-health staff, and the prisoners should be moved out of segregation as soon as possible and have access to treatment and monitoring in the meantime.

*Braggs*, 257 F. Supp. 3d at 1247.

### C. ADOC Defendants' Deliberate Indifference to Inmates' Serious Medical Needs and Treatment Deficiencies

162.    At all relevant times, ADOC received monthly statistical reports and annual contract-compliance reports from MHM and WEXFORD.

163.    At all relevant times, ADOC frequently communicated with high-level MHM and WEXFORD officials through correspondence, quarterly meetings, and corrective-action plans from MHM following audits.

164.    ADOC performed two audits of MHM's overall contract compliance since 2011.

165.    On information and belief, ADOC has performed no audits of WEXFORD's overall contract compliance since entering into a contract for mental health services with WEXFORD.

166.    At all relevant times, ADOC, including Defendants Dunn, Naglich, Stewart, Files, Patrick, Warden Doe I, and Bolling, understood that overcrowding of inmates and understaffing of mental health and correctional staff presented adverse impacts on severely mentally ill inmates.

167. Defendant Naglich admitted in trial testimony in *Braggs* that she was aware that MHM's performance of its services had been historically deficient and that MHM had an inadequate quality control process.

168. Defendant Naglich likewise admitted in her *Braggs* testimony that, despite her knowledge of MHM's deficient performance in providing prisoner health care, she did not monitor MHM to ensure they provided minimally adequate mental health care to prisoners.

169. Defendant Naglich admitted in her *Braggs* testimony she had been aware that MHM had been chronically understaffed since 2013 and remained understaffed at the time of her testimony.

170. Defendants Dunn and Naglich were aware that, since at least 2010, MHM and WEXFORD had been unable to meet their contractual requirements due to staffing deficiencies and high caseloads.

171. Defendant Dunn noted in his testimony that ADOC's ability to provide adequate mental health care to inmates suffered due to both overcrowding and understaffing.

172. From 2011 to 2016, MHM reported annually to Defendant Naglich and the OHS that multiple facilities were suffering from staffing shortages which "compromise[ed] [MHM's] ability to provide monthly follow-up for all caseload inmates."

173. These staffing shortages persisted following WEXFORD's assumption of ADOC's mental health caseload; Defendants Dunn and Naglich were aware this problem went unrectified.

174. Defendants Dunn and Naglich acknowledged in their *Braggs* testimony that insufficient staffing of correctional officers compounded the problem of insufficient mental-health staffing.

175.    Defendants Dunn and Naglich had been informed repeatedly by MHM and WEXFORD prior to the deaths of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford that deficiencies in staffing were placing severely mentally ill inmates at a high risk of decompensation.

176.    Defendants Naglich and Dunn had been informed that ADOC's, MHM's, and WEXFORD's processes for identifying and classifying mentally ill prisoners were deficient.

177.    From 2011 to 2016, Defendant MHM annually reported to ADOC, including Defendants Dunn and Naglich, that treatment plans for mentally ill inmates were deficient across all levels of care, from outpatient to crisis care.

178.    Treatment plans for mentally ill inmates remained deficient across all levels of care following WEXFORD's assumption of ADOC's mental health caseload; Defendants Dunn and Naglich were aware this deficiency persisted.

179.    At all relevant times, monthly statistical reports from MHM to Defendants Dunn and Naglich informed them that little to no group counseling was occurring at any ADOC facility.

180.    At all relevant times, Defendant Dunn has personally reviewed suicide incident reports and has been aware of a steady increase in suicides; he was directly aware that most of these suicides were committed by hanging in segregation.

181.    Defendant Naglich admitted that, at all relevant times prior to the death of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, that not having a constant-watch procedure for acutely suicidal inmates was a serious problem, posing a risk of harm and death.

182.    On a nearly monthly basis for years prior to the deaths of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, MHM warned Defendants Dunn and Naglich of the

risk of decompensation, self-harm, and death, that segregation practices pose to mentally ill prisoners, and that all facilities nonetheless placed mentally ill prisoners in segregation.

183.    Prior to the deaths of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, Defendants Dunn and Naglich had been repeatedly informed by mental health staff that patients in segregation, across all facilities, were not receiving treatment.

184.    Defendants were aware prior to the deaths of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford  that suicide watch or mental health checks occurring at highly regular, pre-ordained intervals would allow suicidal or otherwise severely mentally ill inmates to predict cell checks and otherwise self-harm in observation aps.

185.    At all relevant times, despite prohibitions at the administrative and standard of care level prohibiting pre-ordained, regular suicide watch or mental health checks, Defendants permitted and undertook theses pre-ordained, regular checks, or otherwise did not make these checks at all.

186.    At all relevant times, Defendants were aware that constant supervision was not being provided for acutely suicidal prisoners, despite contractual obligations and applicable jurisdictional standards of care requiring constant supervision.

187.    At all relevant times prior to Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford's deaths, Defendant Dunn evinced an intent to the Middle District of Alabama to keep constant-watch procedures in place for acutely suicidal prisoners until otherwise ordered by the Courts.

188.    Despite this articulated promise, at all relevant times, Defendant Dunn and his fellow Defendants did not maintain constant watch on acutely suicidal prisoners.

26

189.    Despite this evinced promise, and despite the projected annual budget for a constant-watch procedure of over $4,000,000.00, prior to Billy Thornton's death, Defendant Dunn allocated only $200,000.00 to meet the immediate needs of the interim agreement entered into by ADOC to provide constant watch.

190.    As early as 2013, Defendants Dunn, Naglich, and MHM concluded as a result of an audit of mental health services that ADOC "automatically" applied discipline to male inmates engaging in self-injurious behavior.

191.    Despite this assessment, Defendants did not implement any plan to reduce or eliminate disciplinary punishment for self-injurious behavior, or behavior manifesting from mental illness.

192.    Defendant Naglich admitted in the course of the *Braggs* testimony that, in the years preceding the deaths of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, ADOC and MHM had been aware of the practice of automatically applying disciplinary sanctions for self-injury and mentally ill prisoners' overrepresentation in segregation.

193.    Defendant Naglich admitted in her *Braggs* testimony in 2017 that placing seriously mentally ill prisoners in segregation is "categorically inappropriate" and amounts to "denial of minimal medical care."

194.    The Middle District of Alabama held in *Braggs* that ADOC's Office of Health Services had historically done "vanishingly little to exercise oversight of the provision of care to mentally ill prisoners," and that "ADOC has known that MHM's own quality-control process is hopelessly inadequate in implementing corrective actions."

195.   Despite this knowledge, and despite Defendants Dunn and Naglich's own dissatisfaction with MHM's contract compliance, Defendants Dunn and Naglich elected to extend ADOC's contract with MHM in September 2016.

196.   At all relevant times, MHM and WEXFORD did not monitor the implementation of corrective actions for its mental health provision to inmates.

197.   For years prior to the deaths of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, Defendants Dunn and Naglich did not review MHM's or WEXFORD's contract compliance reports in full or take corrective actions based on their findings.

198.   Although ADOC's contracts with MHM and WEXFORD have permitted ADOC officials to access MHM's and WEXFORD's files, to conduct scheduled and unscheduled performance reviews, and to assess fines for contract noncompliance, Defendants Dunn and Naglich have not done so.

199.   Defendant Dunn has admitted that, at all relevant times, he personally tracks suicide rates and reviews incident reports of suicides, but that prior to the deaths of Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford, he had never ordered his staff to take any concrete measures to correct the rate of suicide, nor had asked for a written report or follow-up on the process.

200.   Defendant Naglich was aware of ADOC's increasing suicide rate in the years leading up to Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford's deaths, as well as the risk factors for suicides, but made no effort to address the problem.

201.   Despite the entry of an interim suicide prevention agreement in early 2017 between the ADOC and a class of plaintiffs in *Braggs*, Defendants continued to demonstrate noncompliance, including the lack of a constant-watch procedure for acutely suicidal

individuals, the continued placement of severely mentally ill prisoners in segregation, and the lack of staggered-interval checks of inmates on suicide watch.

202. At all relevant times, Defendant Stewart, as Warden of Holman, was aware of the deficiencies of ADOC, WEXFORD, and MHM's provision of treatment to mentally ill prisoners in her custody.

203. At all relevant times, Defendant Stewart, as Warden of Holman, had the authority to order the provision of appropriate treatment to mentally ill prisoners in her custody, including Billy Thornton and Ryan Rust.

204. At all relevant times, Defendants Files, and/or Patrick, and/or Warden Doe I, as Wardens of Limestone, was/were aware of the deficiencies of ADOC and WEXFORD's provision of treatment to mentally ill prisoners in his custody.

205. At all relevant times, Defendants Files, and/or Patrick, and/or Warden Doe I, as Wardens of Limestone, had the authority to order the provision of appropriate treatment to mentally ill prisoners in his custody, including Matthew Holmes.

206. At all relevant times, Defendant Bolling, as Warden of Kilby, was aware of the deficiencies of ADOC and WEXFORD's provision of treatment to mentally ill prisoners in his custody.

207. At all relevant times, Defendant Bolling, as Warden of Kilby, had the authority to order the provision of appropriate treatment to mentally ill prisoners in his custody, including Paul Ford.

### D. Continued Deficiencies by Wexford and Naglich

208.    Defendant WEXFORD was aware of the aforementioned deficiencies in ADOC and MHM's provision of mental health care at the time it entered into a contract with ADOC to provide mental health care in or about mid-2018.

209.    Defendant WEXFORD was familiar with MHM's previous reports to and audits by ADOC and Defendant Naglich at the time it entered into its contract with ADOC.

210.    Despite this awareness, Defendant WEXFORD condoned and perpetuated these deficiencies, including but not limited to the understaffing of correctional and mental health staff, the placement of severely mentally ill inmates in segregation, the failure to maintain adequate mental health plans, and the failure to implement adequate suicide prevention measures.

211.    As head of OHS, Defendant Naglich was aware of the deficiencies in ADOC's and MHM's provision of mental health care.

212.    Defendant Naglich was familiar with mental health reports submitted to and audits by ADOC and had access to relevant information compiled about mental health care of ADOC inmates.

213.    Defendant Naglich was familiar with the *Braggs* litigation and the obligations placed on ADOC by the order of the Middle District of Alabama.

214.    Despite this awareness, Defendant Naglich condoned and perpetuated these aforementioned deficiencies, including but not limited to the understaffing of correctional and mental health staff, the placement of severely mentally ill inmates in segregation, the failure to maintain adequate mental health plans, and the failure to implement adequate suicide prevention measures.

**E. The Death of Billy Lee Thornton**

30

215. At all relevant times, Billy Lee Thornton was incarcerated at Holman, and Fountain Correctional Facility ("Fountain"), located in Escambia County, Alabama.

216. At all relevant times, Holman was classified as a close custody correctional facility.

217. On December 27, 2017, Thornton was observed attempting to hang himself.

218. On December 27, 2017, following his attempt to hang himself, Thornton notified a nurse that he wanted to kill himself.

219. On December 27, 2017, following his attempt to hang himself, Thornton notified a nurse that he had suicidal thoughts, and had experienced auditory hallucinations of "kill, kill yourself."

220. On December 27, 2017, following his attempt to hang himself, Thornton notified a nurse that he believed his psychotropic medications were no longer working.

221. Thornton was subsequently transferred to Fountain Correctional Facility, located in Escambia County, Alabama, where he was placed on mental health observation.

222. Following his December 27, 2017 suicide attempt, Thornton was not placed on acute suicide watch.

223. No suicide risk assessment was conducted during Thornton's December 27, 2017-January 3, 2018 mental health observation placement.

224. Thornton was released from mental health observation on January 3, 2018.

225. Thornton was not given any mental health follow-up appointments relating to his suicide attempt following his discharge from mental health observation on January 3, 2018.

226.   Following his discharge from mental health observation on January 3, 2018, Thornton was returned to Holman.

227.   After returning to Holman, Thornton was seen only once by Holman's mental health staff.

228.   Mr. Thornton was returned to Fountain on February 22, 2018, where he was placed on mental health observation.

229.   Thornton was released back to Holman on February 23, 2018, where he was returned to segregation housing.

230.   Thornton was not given any mental-health follow-up appointments relating to his suicide attempt following his discharge from mental health observation on February 23, 2018.

231.   No suicide risk assessments were conducted for Thornton's February 22-23, 2018 mental health observation placement.

232.   On February 26, 2018, Thornton was housed in segregation housing.

233.   On or about February 26, 2018, as a correctional officer was speaking to Thornton in his segregation cell, Thornton stepped onto his bed, placed a shoestring around his neck, and hung himself from a light fixture within his cell.

234.   As the officer reached toward Thornton, the string broke, and Thornton fell and struck his head on the floor.

235.   Thornton sustained a severe closed head injury as a result of falling to the floor.

236.   After observing this fall, officers did not call the medical unit for an emergency response.

237.   Following his fall, officers placed Thornton in a wheelchair and took him to the medical unit.

238.   Billy Thornton died on or about March 2, 2018 as a result of his head injury.

239.   At all relevant times prior to his death, Billy Thornton had serious mental-health care needs, in that he engaged in repeated acts of self-harm and showed outward signs of mania and depression.

**F.  The Death of Paul Ford**

240.   In April of 2018, while being housed in segregation at Holman, Paul Ford set fire to his cell and attempted to hang himself.

241.   On July 30, 2018, while being housed in segregation at Holman, Ford made a second attempt to hang himself.

242.   As a result of his July 30, 2018 suicide attempt, Ford was transferred to Donaldson Correctional Facility and placed on suicide watch.

243.   Ford was released from suicide watch on August 2, 2018, and was placed in segregation.

244.   Ford was transferred to Kilby Correctional Facility in August of 2018.

245.   Following Ford's discharge from suicide watch on August 2, 2018 and transfer to Kilby, Ford was not given any follow-up mental health appointments relating to his suicide attempt.

246.   Ford's initial mental health assessment in segregation failed to note his history of suicide attempts and left the "assessment" section blank.

247.   On December 12, 2018, Ford cut his wrist while in segregation at Kilby.

248.   As a result of Ford's December 12, 2018 wrist cutting, he was charged with a disciplinary violation.

249.   On December 12, 2018, Ford was placed on suicide watch.

250.   Despite Mr. Ford's self-injurious behavior only eight days before, the suicide risk assessment performed on Mr. Ford stated that he had no recent suicidal or self-injurious behavior or ideation.

251.   Ford was released from suicide watch back into segregation on December 21, 2018.

252.   Following Ford's discharge from suicide watch on December 21, 2018, Ford was not given any follow-up mental health appointments relating to his suicide attempt.

253.   On January 16, 2019, while housed in segregation, less than a month after being released from suicide watch, Ford was found hanging from his segregation cell door.

254.   Paul Ford died on January 16, 2019 as a result of his successful suicide attempt.

255.   At all relevant times prior to his death, Paul Ford had serious mental-health care needs, in that he engaged in repeated acts of self-harm and showed outward signs of mania and depression.

### G. The Death of Ryan Rust

256.   In April of 2016, Ryan Rust intentionally swallowed a razor blade and a belt buckle while in ADOC custody, which was noted in contemporaneous psychological records.

257.   On November 15, 2018, Ryan Rust was out-gated from Fountain Correctional Facility ("Fountain"), located in Escambia County, Alabama, to the Baldwin County Jail.

258.    On November 15, 2018, after his arrival to the Baldwin County Jail, Ryan Rust obtained and intentionally swallowed a razor blade.

259.    On November 15, 2018, Ryan Rust reported to Baldwin County medical staff that he had swallowed a razor blade.

260.    On November 15, 2018, Ryan Rust was returned to Fountain.

261.    Rust denied to medical staff at Fountain that swallowing the razor blade was an attempt at suicide.

262.    On November 15 to 16, 2018, Rust was placed on suicide watch at Fountain Correctional Facility, located in Escambia County, Alabama.

263.    Rust was not given any mental health follow-up appointments following his discharge from mental health observation on November 16, 2018.

264.    On December 19, 2018 Rust attempted to escape from Fountain, but was unsuccessful.

265.    Rust was transferred to Escambia County Jail on December 21, 2018.

266.    As a result of his escape attempt, rather than being given psychological treatment, Rust was transferred back to Holman Correctional and returned to segregation housing on December 20 or 21, 2018.

267.    Rust received three separate segregation pre-placement screenings on December 20 and 21, 2018, due to the insufficiency of information contained within the first two; the third failed to note Rust's emergent mental health status.

268.    Despite medical staff's awareness of Rust's mental health status and Rust's swallowing of a razor blade, staff conducting these pre-placement screenings did not indicate a need for an urgent or emergent mental health referral.

269.    Following Rust's placement in segregation on December 20th, 2018, he was not placed on any observation.

270.    On December 21, 2018, shortly after his segregation placement, Rust was discovered hanging in his cell, seated on the floor with one end of belt around his neck and the other tied to a bar in the window of his cell.

271.    Duty logs of correctional officers from December 21, 2018 indicate that more than an hour passed from the time of the last security check to the time that Rust was discovered hanging.

272.    At all relevant times prior to his death, Ryan Rust had serious mental-health care needs, in that he engaged in repeated acts of self-harm and showed outward signs of mania and depression.

**H. The Death of Matthew Holmes**

273.    At all relevant times, Matthew Holmes was incarcerated at Limestone Correctional Facility, located in Harvest, County of Limestone, Alabama.

274.    On February 11, 2019, despite a diagnosis of mental illness and a history of suicide attempts, Holmes was transferred from mental health observation to segregation.

275.    A psychiatrist/CRNP progress note entered at Limestone on February 12th, 2019 indicates that Mr. Holmes had become suicidal after being placed in segregation.

276.    This psychiatrist/CRNP note indicated that Holmes had attempted suicide on two occasions in 2010.

277.    At no time in February of 2019 was Holmes placed on suicide watch.

278.    Because Holmes was not placed on suicide watch, he did not receive a suicide risk assessment.

36

279.    ADOC did not generate an emergency referral to mental health in response to a positive pre-placement screen.

280.    A February 13th, 2019 treatment plan review stated that Holmes was "not making progress toward treatment plan goals."

281.    The following day, February 14th, 2019, despite the previous day's treatment plan review, Holmes's treatment plan review abruptly concluded that Holmes had "completed treatment goal."

282.    The segregation pre-placement screening completed for Holmes at 11:15 a.m. on February 14th, 2019 noted that Holmes had a serious mental illness.

283.    The segregation pre-placement screening completed for Holmes at 11:15 a.m. on February 14th, 2019 noted that Holmes had responded affirmatively to the questions "Are you feeling sad, hopeless, or depressed?", "Have you ever intentionally hurt yourself or attempted suicide?", and "Have you had any serious problems with a significant other, family member or friend recently?"

284.    Despite this assessment, on February 14th, Holmes was ordered released from mental health observation to segregation, on the order of a nurse practitioner.

285.    Said practitioner documented no note explaining the rationale for this decision of the level of risk assessed.

286.    In response to this assessment, an "urgent," rather than "emergent" referral to mental health was made.

287.    On February 14, 2019, at 10:43 p.m., within 12 hours of being placed in segregation, Matthew Holmes was discovered hanging from an overhead light fixture in his segregation cell.

288.  Matthew Holmes died as a result of his hanging.

289.  At all relevant times prior to his death, Matthew Holmes had serious mental-health care needs, in that he engaged in repeated acts of self-harm and showed outward signs of mania and depression.

## Count 1: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### (Betty Head vs. Defendants Dunn, Naglich and Stewart)

290.  Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

291.  At all relevant times, Defendants DUNN, NAGLICH, and STEWART and their agents, employees, agents, and/or officers, including JOHN DOES I-XVI, were acting pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendants DUNN, NAGLICH and STEWART.

292.  At all times relevant, it was the duty of Defendants DUNN, NAGLICH and STEWART to refrain from subjecting others to a deprivation of Constitutional rights, including Billy Thornton.

293.  At all relevant times, in breach of said duty, Defendants DUNN, NAGLICH, and STEWART subjected decedent Billy Thornton to deprivation of rights in violation of the privileges and immunities secured to Billy Thornton by the Eighth Amendment to the United States Constitution by engaging in the following policies, practices, and customs:

   a.  Failing to identify prisoners, including Billy Thornton, with serious mental-health needs and to classify their needs properly;
   b.  Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Billy Thornton;
   c.  Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Billy Thornton;
   d.  Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Billy Thornton;

    e. Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Billy Thornton;

    f. Imposing disciplinary sanctions on mentally ill prisoners, including Billy Thornton, for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health; and

    g. Placing seriously mentally ill prisoners, including Billy Thornton, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Billy Thornton, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Billy Thornton.

294. Defendants DUNN, NAGLICH and STEWART, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, these Defendants condoned, tolerated and through their own actions or inactions thereby ratified such policies.

295. At all times, Defendants DUNN, NAGLICH and STEWART were aware of the risk of serious harm to seriously mentally ill prisoners, including Billy Thornton, resulting from the aforementioned policies.

296. Such Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of decedent, Billy Thornton, as well as its detrimental impact on the confidence the public has in the correctional body that serves it.

297. As a direct and proximate result of the Constitutional violations caused by Defendants DUNN, NAGLICH and STEWART, the employees, agents and/or officers of ADOC and the William C. Holman Correctional Facility, and other policymakers, decedent Billy Thornton was deprived of his liberty and suffered damages, including death.

298.    As a direct result of the Constitutional violations caused by Defendants DUNN, NAGLICH, and STEWART, the employees, agents and/or officers of ADOC and the William C. Holman Correctional Facility, and other policymakers, decedent BILLY THORNTON's heirs suffered personal and pecuniary losses.

WHEREFORE, Plaintiff BETTY HEAD respectfully requests that this Court enter judgment against Defendants, DUNN, NAGLICH, and STEWART, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 2: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Betty Head vs. Defendants John Doe I-II)*

299.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

300.    At all material times, Billy Thornton was experiencing a serious medical need requiring treatment.

301.    At all material times, Defendants JOHN DOE I and II knew of Billy Thornton's serious medical need.

302.    Despite this knowledge, Defendants JOHN DOE I and II intentionally and deliberately delayed and/or failed to provide Billy Thornton his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

303.    In so doing, Defendants JOHN DOE I and II consciously disregarded a substantial risk of causing harm or death to Billy Thornton.

304.    The aforementioned conduct of Defendants JOHN DOE I and II in refusal to provide Billy Thornton adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

305.    At all material times, Defendants JOHN DOE I and II were acting under color and authority of state law as agents and employees of Defendants DUNN and STEWART, and were acting under color and authority of state law.

306.    At all times relevant, it was the duty of Defendant JOHN DOE I and II, to refrain from subjecting others to a deprivation of rights, including decedent Billy Thornton.

307.    In breach of said duty, Defendants JOHN DOE I and II subjected decedent Billy Thornton to deprivation of rights in violation of the privileges and immunities secured to Billy Thornton by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

   a.  Failure to provide sufficient monitoring to seriously mentally ill and/or suicidal inmates, including Billy Thornton;
   b.  Failure to enact suicide-prevention measures to seriously mentally ill and/or suicidal inmates, including Billy Thornton;
   c.  Placement of seriously mentally ill and/or suicidal inmates, including Billy Thornton, in segregation;
   d.  Failure to recommend or refer seriously mentally ill and/or suicidal inmates, including Billy Thornton, to needed psychological treatment;
   e.  Failure to transport seriously mentally ill and/or suicidal inmates, including Billy Thornton, to scheduled and necessary psychological treatment;
   f.  Failure to ensure the cells of seriously mentally ill and/or suicidal inmates, including Billy Thornton, were free from means of self-harm or suicide attempts; and
   g.  Removing Billy Thornton from the ground and placing him in a wheelchair, despite suspected head and neck injury, rather than placing him on a back board or contacting medical staff.

308.    The aforementioned conduct of Defendants JOHN DOE I and II was objectively unreasonable.

309.    As a result of Defendants JOHN DOE I and II's unjustified failures in providing medical care, Billy Thornton experienced extreme and unneeded physical and mental pain, and ultimately died.

310.    The acts or omissions of Defendants as described herein deprived Billy Thornton of his constitutional rights and caused him other damages.

311.    As a proximate result of Defendants' unlawful conduct, Billy Thornton suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

312.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

313.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, BETTY HEAD respectfully requests that this Court enter judgment against Defendants JOHN DOE I and II, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 3: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Betty Head vs. Defendants John Doe IX and X)*

314.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

315.    At all material times, Billy Thornton was experiencing a serious medical need requiring treatment.

316.    At all material times, Defendants JOHN DOE IX and X knew of Billy Thornton's serious medical need.

317.    Despite this knowledge, Defendants JOHN DOE IX and X intentionally and deliberately delayed and/or failed to provide Billy Thornton his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

318.    In so doing, Defendants JOHN DOE IX and X consciously disregarded a substantial risk of causing harm or death to Billy Thornton.

319.    The aforementioned conduct of Defendants JOHN DOE IX and X in refusal to provide Billy Thornton adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

320.    At all material times, Defendants JOHN DOE IX and X were acting under color and authority of state law as agents and employees of Defendants DUNN, NAGLICH and STEWART, by and through MHM CORRECTIONAL SERVICES, INC, and were acting under color and authority of state law.

321.    At all times relevant, it was the duty of Defendants JOHN DOE IX and X to refrain from subjecting others to a deprivation of rights, including decedent Billy Thornton.

322.    At all relevant times, in breach of said duty, Defendants JOHN DOE IX and X subjected decedent Billy Thornton to a deprivation of rights in violation of the privileges and immunities secured to Billy Thornton by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

   a.  Failing to identify Billy Thornton's serious mental-health needs and to classify his needs properly;
   b.  Failing to provide an individual treatment plan to Billy Thornton;
   c.  Placement of seriously mentally ill and/or suicidal inmates, including Billy Thornton, in segregation;
   d.  Failure to refer acutely mentally ill and/or suicidal inmates, including Billy Thornton, to acute or out-of-facility treatment;
   e.  Failure to place Billy Thornton on suicide watch despite suicidal ideation;

43

    f.  Failing to provide adequate psychotherapy to Billy Thornton; and

    g.  Failing to identify Billy Thornton as a suicide risk and to provide adequate treatment and monitoring to prevent suicide.

323.    The aforementioned conduct of Defendants JOHN DOE IX and X was objectively unreasonable.

324.    As a result of Defendants JOHN DOE IX and X's unjustified delay in providing medical care, Billy Thornton experienced extreme and unneeded physical and mental pain, and ultimately died.

325.    The acts or omissions of Defendants as described herein deprived Billy Thornton of his constitutional rights and caused him other damages.

326.    As a proximate result of Defendants' unlawful conduct, Billy Thornton suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

327.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

328.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, BETTY HEAD respectfully requests that this Court enter judgment against Defendants JOHN DOE IX and X, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 4: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Betty Head vs. Defendant MHM)*

329.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

330.    At all relevant times, MHM administered, referred, and approved medical care for inmates at the Holman Correctional Facility.

331.    At all relevant times, MHM, as well as its agents and employees, acted under color of state law and within the course and scope of their employment.

332.    At all relevant times, MHM had in effect official policies or longstanding practices and customs that condoned and fostered the unconstitutional conduct of JOHN DOES IX and X, and other agents and employees of MHM and/or Holman Correctional Facility, including:

    a.  Failing to identify prisoners, including Billy Thornton, with serious mental-health needs and to classify their needs properly;
    b.  Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Billy Thornton;
    c.  Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Billy Thornton;
    d.  Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Billy Thornton;
    e.  Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Billy Thornton;
    f.  Placing seriously mentally ill prisoners, including Billy Thornton, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Billy Thornton, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Billy Thornton.

333.    JOHN DOES IX and X and other agents and employees of MHM were acting pursuant to these policies, practices, or customs.

334.    MHM failed to properly train or supervise its agents and employees, including JOHN DOES IX and X, on the provision of needed psychological treatment to detainees.

335.    Defendant had actual and/or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, the Defendant condoned, tolerated and through its own actions or inactions thereby ratified such policies.

336.    As such, MHM was deliberately indifferent and reckless with respect to the potential violation of constitutional rights of detainees, including Billy Thornton.

337.    At all relevant times, Billy Thornton had a right to be free from violations of his constitutional rights.

338.    The violation of Billy Thornton's constitutional rights by JOHN DOES IX and X was the plainly obvious consequences of Defendant MHM's failures.

339.    The acts or omissions of Defendant as described herein Billy Thornton of his constitutional rights and caused him other damages.

340.    As a proximate result of Defendant's unlawful conduct, Billy Thornton suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

341.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

342.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, BETTY HEAD respectfully requests that this Court enter judgment against Defendant MHM, including awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

## Count 5: Wrongful Death
### (Betty Head vs. Defendants Dunn, Naglich, Stewart, John Does I-II and IX-X, and MHM)

343.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

344.   At all times, Defendants had a duty to refrain from acts and omissions which could cause the inmates of Holman Correctional Facility unnecessary and unwarranted harm.

345.   The acts or omissions of Defendants as described herein caused Billy Thornton's injuries, including his death.

346.   As a proximate result of Defendants' unlawful conduct, Billy Thornton suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, physical injuries, extraordinary pain and suffering, and emotional distress.

WHEREFORE, BETTY HEAD respectfully requests that this Court enter judgment against Defendants, including awarding compensatory damages, punitive damages, and for any further relief this Court deems just.

## Count 6: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### (Jeff Rust vs. Defendants Dunn, Naglich and Stewart)

347.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

47

348. At all relevant times, Defendants DUNN, NAGLICH and STEWART and their agents, employees, agents, and/or officers, including JOHN DOES I-XVI, were acting pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendants DUNN, NAGLICH and STEWART.

349. At all times relevant, it was the duty of Defendants DUNN, NAGLICH and STEWART to refrain from subjecting others to a deprivation of Constitutional rights, including Ryan Rust.

350. At all relevant times, in breach of said duty, Defendants DUNN, NAGLICH and STEWART subjected decedent Ryan Rust to deprivation of rights in violation of the privileges and immunities secured to Ryan Rust by the Eighth Amendment to the United States Constitution by engaging in the following policies, practices, and customs:

      a. Failing to identify prisoners, including Ryan Rust, with serious mental-health needs and to classify their needs properly;

      b. Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Ryan Rust;

      c. Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Ryan Rust;

      d. Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Ryan Rust;

      e. Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Ryan Rust;

      f. Imposing disciplinary sanctions on mentally ill prisoners, including Ryan Rust, for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health; and

      g. Placing seriously mentally ill prisoners, including Ryan Rust, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Ryan Rust, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Ryan Rust.

351.    Defendants DUNN, NAGLICH and STEWART, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, these Defendants condoned, tolerated and through their own actions or inactions thereby ratified such policies.

352.    At all times, Defendants DUNN, NAGLICH and STEWART were aware of the risk of serious harm to seriously mentally ill prisoners, including Ryan Rust, resulting from the aforementioned policies.

353.    Such Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of decedent, Ryan Rust, as well as its detrimental impact on the confidence the public has in the correctional body that serves it.

354.    As a direct and proximate result of the Constitutional violations caused by Defendants DUNN, NAGLICH and STEWART, the employees, agents and/or officers of ADOC and the Holman Correctional Facility, and other policymakers, decedent Ryan Rust was deprived of his liberty and suffered damages, including death.

355.    As a direct of the Constitutional violations caused by Defendants DUNN, NAGLICH and STEWART, the employees, agents and/or officers of ADOC and the Holman Correctional Facility, and other policymakers, decedent RYAN RUST's heirs suffered personal and pecuniary losses.

WHEREFORE, Plaintiff JEFF RUST respectfully requests that this Court enter judgment against Defendants, DUNN, NAGLICH and STEWART, awarding

compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

## Count 7: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### (Jeff Rust vs. Defendants John Doe III and IV)

356.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

357.   At all material times, Ryan Rust was experiencing a serious medical need requiring treatment.

358.   At all material times, Defendants JOHN DOE III and IV knew of Ryan Rust's serious medical need.

359.   Despite this knowledge, Defendants JOHN DOE III and IV intentionally and deliberately delayed and/or failed to provide Ryan Rust his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

360.   In so doing, Defendants JOHN DOE III and IV consciously disregarded a substantial risk of causing harm or death to Ryan Rust.

361.   The aforementioned conduct of Defendants JOHN DOE III and IV in refusal to provide Ryan Rust adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

362.   At all material times, Defendants JOHN DOE III and IV were acting under color and authority of state law as agents and employees of Defendants DUNN and STEWART, and were acting under color and authority of state law.

363.   At all times relevant, it was the duty of Defendant JOHN DOE III and IV, to refrain from subjecting others to a deprivation of rights, including decedent Ryan Rust.

364. In breach of said duty, Defendants JOHN DOE III and IV subjected decedent Ryan Rust to deprivation of rights in violation of the privileges and immunities secured to Ryan Rust by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

    a. Failure to provide sufficient monitoring to seriously mentally ill and/or suicidal inmates, including Ryan Rust;

    b. Failure to enact suicide-prevention measures to seriously mentally ill and/or suicidal inmates, including Ryan Rust;

    c. Failure to recommend or refer seriously mentally ill and/or suicidal inmates, including Ryan Rust, to needed psychological treatment;

    d. Placement of seriously mentally ill and/or suicidal inmates, including Ryan Rust, in segregation;

    e. Failure to transport seriously mentally ill and/or suicidal inmates, including Ryan Rust, to scheduled and necessary psychological treatment; and

    f. Failure to ensure the cells of seriously mentally ill and/or suicidal inmates, including Ryan Rust, were free from means of self-harm or suicide attempts.

365. The aforementioned conduct of Defendants JOHN DOE III and IV was objectively unreasonable.

366. As a result of Defendants JOHN DOE III and IVs' unjustified failures in providing medical care, Ryan Rust experienced extreme and unneeded physical and mental pain, and ultimately died.

367. The acts or omissions of Defendants as described herein deprived Ryan Rust of his constitutional rights and caused him other damages.

368. As a proximate result of Defendants' unlawful conduct, Ryan Rust suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

369.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

370.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, JEFF RUST respectfully requests that this Court enter judgment against Defendants JOHN DOE III and IV, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

## Count 8: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Jeff Rust vs. Defendants John Doe XI and XII)*

371.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

372.    At all material times, Ryan Rust was experiencing a serious medical need requiring treatment.

373.    At all material times, Defendants JOHN DOE XI and XII knew of Ryan Rust's serious medical need.

374.    Despite this knowledge, Defendants JOHN DOE XI and XII intentionally and deliberately delayed and/or failed to provide Ryan Rust his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

375.    In so doing, Defendants JOHN DOE XI and XII consciously disregarded a substantial risk of causing harm or death to Ryan Rust.

376.    The aforementioned conduct of Defendants JOHN DOE XI and XII in refusal to provide Ryan Rust adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

377.   At all material times, Defendants JOHN DOE XI and XII were acting under color and authority of state law as agents and employees of Defendants DUNN, NAGLICH and STEWART, by and through WEXFORD, and were acting under color and authority of state law.

378.   At all times relevant, it was the duty of Defendants JOHN DOE XI and XII to refrain from subjecting others to a deprivation of rights, including decedent Ryan Rust.

379.   At all relevant times, in breach of said duty, Defendants JOHN DOE XI and XII subjected decedent Ryan Rust to a deprivation of rights in violation of the privileges and immunities secured to Ryan Rust by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

    a.  Failing to identify Ryan Rust's serious mental-health needs and to classify his needs properly;
    b.  Failing to provide an individual treatment plan to Ryan Rust;
    c.  Placement of seriously mentally ill and/or suicidal inmates, including Ryan Rust, in segregation;
    d.  Failing to provide adequate psychotherapy to Ryan Rust; and
    e.  Failing to identify Ryan Rust as a suicide risk and to provide adequate treatment and monitoring to prevent suicide.

380.   The aforementioned conduct of Defendants JOHN DOE XI and XII was objectively unreasonable.

381.   As a result of Defendants JOHN DOE XI and XIIs' unjustified failure to provide medical care, Ryan Rust experienced extreme and unneeded physical and mental pain, and ultimately died.

382.   The acts or omissions of Defendants as described herein deprived Ryan Rust of his constitutional rights and caused him other damages.

383.   As a proximate result of Defendants' unlawful conduct, Ryan Rust suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

384.   Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

385.   In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, JEFF RUST respectfully requests that this Court enter judgment against Defendants JOHN DOE XI and XII, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 9: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### *(Jeff Rust vs. Defendant Wexford)*

386.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

387.   At all relevant times, Wexford administered, referred, and approved medical care for inmates at the Holman Correctional Facility.

388.   At all relevant times, Wexford, as well as its agents and employees, acted under color of state law and within the course and scope of their employment.

389.   At all relevant times, Wexford had in effect official policies or longstanding practices and customs that condoned and fostered the unconstitutional conduct of JOHN

DOES XI and XII, and other agents and employees of Wexford and/or Holman Correctional

Facility, including:

    a.  Failing to identify prisoners, including Ryan Rust, with serious mental-health needs and to classify their needs properly;

    b.  Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Ryan Rust;

    c.  Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Ryan Rust;

    d.  Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Ryan Rust;

    e.  Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Ryan Rust;

    f.  Placing seriously mentally ill prisoners, including Ryan Rust, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Ryan Rust, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Ryan Rust.

390.    JOHN DOES XI and XII and other agents and employees of Wexford were acting pursuant to these policies, practices, or customs.

391.    Wexford failed to properly train or supervise its agents and employees, including JOHN DOES XI and XII, on the provision of needed psychological treatment to detainees.

392.    Defendant had actual and/or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, the Defendant condoned, tolerated and through its own actions or inactions thereby ratified such policies.

393.    As such, Wexford was deliberately indifferent and reckless with respect to the potential violation of constitutional rights of detainees, including Ryan Rust.

394.    At all relevant times, Ryan Rust had a right to be free from violations of his constitutional rights.

395. The violation of Ryan Rust's constitutional rights by JOHN DOES XI and XII was the plainly obvious consequences of Defendant Wexford's failures.

396. The acts or omissions of Defendant as described herein Ryan Rust of his constitutional rights and caused him other damages.

397. As a proximate result of Defendant's unlawful conduct, Ryan Rust suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

398. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

399. In addition to compensatory, damages, Plaintiff entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, JEFF RUST respectfully requests that this Court enter judgment against Defendant Wexford, including awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

## Count 10: Wrongful Death
### *(Jeff Rust vs. Defendants Dunn, Naglich, Stewart, John Does III-IV and XI-XII, and Wexford)*

400. Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

401. At all times, Defendants had a duty to refrain from acts and omissions which could cause the inmates of Holman Correctional Facility unnecessary and unwarranted harm.

56

402.    The acts or omissions of Defendants as described herein caused Ryan Rust's injuries, including his death.

403.    As a proximate result of Defendants' unlawful conduct, Ryan Rust suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, physical injuries, extraordinary pain and suffering, and emotional distress.

WHEREFORE, JEFF RUST respectfully requests that this Court enter judgment against Defendants, including awarding compensatory damages, punitive damages, and for any further relief this Court deems just.

### Count 11: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Theresa Holmes vs. Defendants Dunn, Naglich, Files, and/or Patrick, and/or Warden Doe I)*

404.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

405.    At all relevant times, Defendants DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN DOE I, and their agents, employees, agents, and/or officers, including JOHN DOES I-XVI, were acting pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendants DUNN, NAGLICH, and FILES, and/or PATRICK, and/or WARDEN DOE I.

406.    At all times relevant, it was the duty of Defendants DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN DOE I to refrain from subjecting others to a deprivation of Constitutional rights, including Matthew Holmes.

407.    At all relevant times, in breach of said duty, Defendants DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN DOE I subjected decedent Matthew Holmes

to deprivation of rights in violation of the privileges and immunities secured to Matthew

Holmes by the Eighth Amendment to the United States Constitution by engaging in the

following policies, practices, and customs:

    a.  Failing to identify prisoners, including Matthew Holmes, with serious mental-health needs and to classify their needs properly;

    b.  Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Matthew Holmes;

    c.  Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Matthew Holmes;

    d.  Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Matthew Holmes;

    e.  Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Matthew Holmes;

    f.  Imposing disciplinary sanctions on mentally ill prisoners, including Matthew Holmes, for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health; and

    g.  Placing seriously mentally ill prisoners, including Matthew Holmes, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Matthew Holmes, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Matthew Holmes.

408.    Defendants DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN

DOE I, together with various other officials, whether named or unnamed, had either actual

or constructive knowledge of the deficient policies, practices and customs alleged above.

Despite having knowledge of the above, these Defendants condoned, tolerated and through

their own actions or inactions thereby ratified such policies.

409.    At all times, Defendants DUNN, NAGLICH, FILES, and/or PATRICK,

and/or WARDEN DOE I were aware of the risk of serious harm to seriously mentally ill

prisoners, including Matthew Holmes, resulting from the aforementioned policies.

410.    Such Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of decedent, Matthew Holmes, as well as its detrimental impact on the confidence the public has in the correctional body that serves it.

411.    As a direct and proximate result of the Constitutional violations caused by Defendants DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN DOE I, the employees, agents and/or officers of ADOC and the Limestone Correctional Facility, and other policymakers, decedent Matthew Holmes was deprived of his liberty and suffered damages, including death.

412.    As a direct result of the Constitutional violations caused by Defendants DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN DOE I, the employees, agents and/or officers of ADOC and the Limestone Correctional Facility, and other policymakers, decedent MATTHEW HOLMES's heirs suffered personal and pecuniary losses.

WHEREFORE, Plaintiff THERESA HOLMES respectfully requests that this Court enter judgment against Defendants, DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN DOE I, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 12: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Theresa Holmes vs. Defendants John Doe V and VI)*

413.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

414.    At all material times, Matthew Holmes was experiencing a serious medical need requiring treatment.

415.    At all material times, Defendants JOHN DOE V and VI knew of Matthew Holmes's serious medical need.

416.    Despite this knowledge, Defendants JOHN DOE V and VI intentionally and deliberately delayed and/or failed to provide Matthew Holmes his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

417.    In so doing, Defendants JOHN DOE V and VI consciously disregarded a substantial risk of causing harm or death to Matthew Holmes.

418.    The aforementioned conduct of Defendants JOHN DOE V and VI in refusal to provide Matthew Holmes adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

419.    At all material times, Defendants JOHN DOE V and VI were acting under color and authority of state law as agents and employees of Defendants DUNN, FILES, and/or PATRICK, and/or WARDEN DOE I, and were acting under color and authority of state law.

420.    At all times relevant, it was the duty of Defendant JOHN DOE V and VI, to refrain from subjecting others to a deprivation of rights, including decedent Matthew Holmes.

421.    In breach of said duty, Defendants JOHN DOE V and VI subjected decedent Matthew Holmes to deprivation of rights in violation of the privileges and immunities secured to Matthew Holmes by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

> h.  Failure to provide sufficient monitoring to seriously mentally ill and/or suicidal inmates, including Matthew Holmes;
> i.  Failure to enact suicide-prevention measures to seriously mentally ill and/or suicidal inmates, including Matthew Holmes;
> j.  Failure to recommend or refer seriously mentally ill and/or suicidal inmates, including Matthew Holmes, to needed psychological treatment;

    k. Placement of seriously mentally ill and/or suicidal inmates, including Matthew Holmes, in segregation;

    l. Failure to transport seriously mentally ill and/or suicidal inmates, including Matthew Holmes, to scheduled and necessary psychological treatment; and

    m. Failure to ensure the cells of seriously mentally ill and/or suicidal inmates, including Matthew Holmes, were free from means of self-harm or suicide attempts.

422.    The aforementioned conduct of Defendants JOHN DOE V and VI was objectively unreasonable.

423.    As a result of Defendants JOHN DOE V and VIs' unjustified failures in providing medical care, Matthew Holmes experienced extreme and unneeded physical and mental pain, and ultimately died.

424.    The acts or omissions of Defendants as described herein deprived Matthew Holmes of his constitutional rights and caused him other damages.

425.    As a proximate result of Defendants' unlawful conduct, Matthew Holmes suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

426.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

427.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, THERESA HOLMES respectfully requests that this Court enter judgment against Defendants JOHN DOE V and VI awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 13: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### *(Theresa Holmes vs. Defendants John Doe XIII-XIV)*

428.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

429.    At all material times, Matthew Holmes was experiencing a serious medical need requiring treatment.

430.    At all material times, Defendants JOHN DOE XIII and XIV knew of Matthew Holmes's serious medical need.

431.    Despite this knowledge, Defendants JOHN DOE XIII and XIV intentionally and deliberately delayed and/or failed to provide Matthew Holmes his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

432.    In so doing, Defendants JOHN DOE XIII and XIV consciously disregarded a substantial risk of causing harm or death to Matthew Holmes.

433.    The aforementioned conduct of Defendants JOHN DOE XIII and XIV in refusal to provide Matthew Holmes adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

434.    At all material times, Defendants JOHN DOE XIII and XIV were acting under color and authority of state law as agents and employees of Defendants DUNN, NAGLICH, FILES, and/or PATRICK, and/or WARDEN DOE I, by and through Wexford, and were acting under color and authority of state law.

62

435. At all times relevant, it was the duty of Defendants JOHN DOE XIII and XIV to refrain from subjecting others to a deprivation of rights, including decedent Matthew Holmes.

436. At all relevant times, in breach of said duty, Defendants JOHN DOE III and IV subjected decedent Matthew Holmes to a deprivation of rights in violation of the privileges and immunities secured to Matthew Holmes by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

    a. Failing to identify Matthew Holmes's serious mental-health needs and to classify his needs properly;

    b. Failure to place Matthew Holmes on suicide watch despite suicidal high suicide risk;

    c. Failing to provide an individual treatment plan to Matthew Holmes;

    d. Failing to provide adequate psychotherapy to Matthew Holmes;

    e. Failure to refer Matthew Holmes to emergent-level or out-of-facility treatment;

    f. Placement of seriously mentally ill and/or suicidal inmates, including Matthew Holmes, in segregation; and

    g. Failing to identify Matthew Holmes as a suicide risk and to provide adequate treatment and monitoring to prevent suicide.

437. The aforementioned conduct of Defendants JOHN DOE XIII and XIV was objectively unreasonable.

438. As a result of Defendants JOHN DOE XIII and XIVs' unjustified delay in providing medical care, Matthew Holmes experienced extreme and unneeded physical and mental pain, and ultimately died.

439. The acts or omissions of Defendants as described herein deprived Matthew Holmes of his constitutional rights and caused him other damages.

440. As a proximate result of Defendants' unlawful conduct, Matthew Holmes suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These

injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

441.   Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

442.   In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, THERESA HOLMES respectfully requests that this Court enter judgment against Defendants JOHN DOE XIII and XIV, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 14: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Theresa Holmes vs. Defendant Wexford)*

443.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

444.   At all relevant times, Wexford administered, referred, and approved medical care for inmates at the Limestone Correctional Facility.

445.   At all relevant times, Wexford, as well as its agents and employees, acted under color of state law and within the course and scope of their employment.

446.   At all relevant times, Wexford had in effect official policies or longstanding practices and customs that condoned and fostered the unconstitutional conduct of JOHN DOES XIII and XIV, and other agents and employees of Wexford and/or Limestone Correctional Facility, including:

       a.  Failing to identify prisoners, including Matthew Holmes, with serious mental-health needs and to classify their needs properly;

       b.  Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Matthew Holmes;

    c.  Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Matthew Holmes;

    d.  Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Matthew Holmes;

    e.  Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Matthew Holmes;

    f.  Placing seriously mentally ill prisoners, including Matthew Holmes, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Matthew Holmes, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Matthew Holmes.

447.    JOHN DOES XIII and XIV and other agents and employees of Wexford were

acting pursuant to these policies, practices, or customs.

448.    Wexford failed to properly train or supervise its agents and employees,

including JOHN DOES XIII and XIV, on the provision of needed psychological treatment to

detainees.

449.    Defendant had actual and/or constructive knowledge of the deficient policies,

practices and customs alleged above. Despite having knowledge of the above, the Defendant

condoned, tolerated and through its own actions or inactions thereby ratified such policies.

450.    As such, Wexford was deliberately indifferent and reckless with respect to the

potential violation of constitutional rights of detainees, including Matthew Holmes.

451.    At all relevant times, Matthew Holmes had a right to be free from violations

of his constitutional rights.

452.    The violation of Matthew Holmes's constitutional rights by JOHN DOES XIII

and XIV was the plainly obvious consequences of Defendant Wexford's failures.

453.    The acts or omissions of Defendant as described herein Matthew Holmes of his constitutional rights and caused him other damages.

454.    As a proximate result of Defendant's unlawful conduct, Matthew Holmes suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

455.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

456.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, THERESA HOLMES respectfully requests that this Court enter judgment against Defendant Wexford, including awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

## Count 15: Wrongful Death
### *(Theresa Holmes vs. Defendants Dunn, Naglich, Files, and/or Patrick, and/or Warden Doe I, John Does V-VI and XIII-XIV, and Wexford)*

457.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

458.    At all times, Defendants had a duty to refrain from acts and omissions which could cause the inmates of Limestone Correctional Facility unnecessary and unwarranted harm.

459.    The acts or omissions of Defendants as described herein caused Matthew Holmes's injuries, including his death.

460.    As a proximate result of Defendants' unlawful conduct, Matthew Holmes suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, physical injuries, extraordinary pain and suffering, and emotional distress.

WHEREFORE, THERESA HOLMES respectfully requests that this Court enter judgment against Defendants, including awarding compensatory damages, punitive damages, and for any further relief this Court deems just.

### Count 16: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Jeri Ford vs. Defendants Dunn, Naglich and Bolling)*

461.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

462.    At all relevant times, Defendants DUNN, NAGLICH and BOLLING, and their agents, employees, agents, and/or officers, including JOHN DOES I-IV, were acting pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendants DUNN, NAGLICH and BOLLING.

463.    At all times relevant, it was the duty of Defendants DUNN, NAGLICH and BOLLING to refrain from subjecting others to a deprivation of Constitutional rights, including Paul Ford.

464.    At all relevant times, in breach of said duty, Defendants DUNN, NAGLICH and BOLLING subjected decedent Paul Ford to deprivation of rights in violation of the privileges and immunities secured to Paul Ford by the Eighth Amendment to the United States Constitution by engaging in the following policies, practices, and customs:

> a.  Failing to identify prisoners, including Paul Ford, with serious mental-health needs and to classify their needs properly;

b. Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Paul Ford;

c. Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Paul Ford;

d. Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Paul Ford;

e. Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Paul Ford;

f. Imposing disciplinary sanctions on mentally ill prisoners, including Paul Ford, for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health; and

g. Placing seriously mentally ill prisoners, including Paul Ford, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Paul Ford, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Paul Ford.

465.    Defendants DUNN, NAGLICH and BOLLING, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, these Defendants condoned, tolerated and through their own actions or inactions thereby ratified such policies.

466.    At all times, Defendants DUNN, NAGLICH and BOLLING were aware of the risk of serious harm to seriously mentally ill prisoners, including Paul Ford, resulting from the aforementioned policies.

467.    Such Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of decedent, Paul Ford, as well as its detrimental impact on the confidence the public has in the correctional body that serves it.

468.    As a direct and proximate result of the Constitutional violations caused by Defendants DUNN, NAGLICH and BOLLING, the employees, agents and/or officers of

ADOC and the Kilby Correctional Facility, and other policymakers, decedent Paul Ford was deprived of his liberty and suffered damages, including death.

469.    As a direct result of the Constitutional violations caused by Defendants DUNN, NAGLICH and BOLLING, the employees, agents and/or officers of ADOC and the Kilby Correctional Facility, and other policymakers, decedent PAUL FORD's heirs suffered personal and pecuniary losses.

WHEREFORE, Plaintiff JERI FORD respectfully requests that this Court enter judgment against Defendants, DUNN, NAGLICH and BOLLING, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 17: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### *(Jeri Ford vs. Defendants John Doe VII and VIII)*

470.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

471.    At all material times, Paul Ford was experiencing a serious medical need requiring treatment.

472.    At all material times, Defendants JOHN DOE VII and VIII knew of Paul Ford's serious medical need.

473.    Despite this knowledge, Defendants JOHN DOE VII and VIII intentionally and deliberately delayed and/or failed to provide Paul Ford his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

474.    In so doing, Defendants JOHN DOE VII and VIII consciously disregarded a substantial risk of causing harm or death to Paul Ford.

475.    The aforementioned conduct of Defendants JOHN DOE VII and VIII in refusal to provide Paul Ford adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

476.    At all material times, Defendants JOHN DOE VII and VIII were acting under color and authority of state law as agents and employees of Defendants DUNN and BOLLING and were acting under color and authority of state law.

477.    At all times relevant, it was the duty of Defendant JOHN DOE VII and VIII, to refrain from subjecting others to a deprivation of rights, including decedent Paul Ford.

478.    In breach of said duty, Defendants JOHN DOE VII and VIII subjected decedent Paul Ford to deprivation of rights in violation of the privileges and immunities secured to Paul Ford by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

   a.  Failure to provide sufficient monitoring to seriously mentally ill and/or suicidal inmates, including Paul Ford;
   b.  Failure to enact suicide-prevention measures to seriously mentally ill and/or suicidal inmates, including Paul Ford;
   c.  Placement of seriously mentally ill and/or suicidal inmates, including Paul Ford, in segregation;
   d.  Failure to recommend or refer seriously mentally ill and/or suicidal inmates, including Paul Ford, to needed psychological treatment;
   e.  Failure to transport seriously mentally ill and/or suicidal inmates, including Paul Ford, to scheduled and necessary psychological treatment; and
   f.  Failure to ensure the cells of seriously mentally ill and/or suicidal inmates, including Paul Ford, were free from means of self-harm or suicide attempts.

479.    The aforementioned conduct of Defendants JOHN DOE VII and VIII was objectively unreasonable.

480.    As a result of Defendants JOHN DOE VII and VIIIs' unjustified failures in providing medical care, Paul Ford experienced extreme and unneeded physical and mental pain, and ultimately died.

481.    The acts or omissions of Defendants as described herein deprived Paul Ford of his constitutional rights and caused him other damages.

482.    As a proximate result of Defendants' unlawful conduct, Paul Ford suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

483.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

484.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, JERI FORD respectfully requests that this Court enter judgment against Defendants JOHN DOE VII and VIII, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 18: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
*(Jeri Ford vs. Defendants John Doe XV and XVI)*

485.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

486.    At all material times, Paul Ford was experiencing a serious medical need requiring treatment.

487.    At all material times, Defendants JOHN DOE XV and XVI knew of Paul Ford's serious medical need.

488.    Despite this knowledge, Defendants JOHN DOE III and IV intentionally and deliberately delayed and/or failed to provide Paul Ford his needed psychological treatment, and intentionally and deliberately provided him inadequate treatment.

489.    In so doing, Defendants JOHN DOE XV and XVI consciously disregarded a substantial risk of causing harm or death to Paul Ford.

490.    The aforementioned conduct of Defendants JOHN DOE XV and XVI in refusal to provide Paul Ford adequate psychological treatment was in violation of the Eighth Amendment to the United States Constitution.

491.    At all material times, Defendants JOHN DOE XV and XVI were acting under color and authority of state law as agents and employees of Defendants DUNN, NAGLICH, and BOLLING, by and through WEXFORD, and were acting under color and authority of state law.

492.    At all times relevant, it was the duty of Defendants JOHN DOE XV and XVI to refrain from subjecting others to a deprivation of rights, including decedent Paul Ford.

493.    At all relevant times, in breach of said duty, Defendants JOHN DOE XV and XVI subjected decedent Paul Ford to a deprivation of rights in violation of the privileges and immunities secured to Paul Ford by the Eighth Amendment to the United States Constitution by engaging in the following acts or omissions:

        a.  Failing to identify Paul Ford's serious mental-health needs and to classify his needs properly;

        b.  Failing to provide an individual treatment plan to Paul Ford;

    c. Placement of seriously mentally ill and/or suicidal inmates, including Paul Ford, in segregation;

    d. Failure to place Paul Ford on suicide watch, despite suicidal ideation;

    e. Failure to refer Paul Ford to acute or out-of-facility treatment;

    f. Failing to provide adequate psychotherapy to Paul Ford; and

    g. Failing to identify Paul Ford as a suicide risk and to provide adequate treatment and monitoring to prevent suicide.

494.    The aforementioned conduct of Defendants JOHN DOE XV and XVI was objectively unreasonable.

495.    As a result of Defendants JOHN DOE XV and XVIs' unjustified delay in and failure to provide medical care, Paul Ford experienced extreme and unneeded physical and mental pain, and ultimately died.

496.    The acts or omissions of Defendants as described herein deprived Paul Ford of his constitutional rights and caused him other damages.

497.    As a proximate result of Defendants' unlawful conduct, Paul Ford suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

498.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

499.    In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, JERI FORD respectfully requests that this Court enter judgment against Defendants JOHN DOE XV and XVI, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 19: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### *(Jeri Ford vs. Defendant Wexford)*

500.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

501.    At all relevant times, Wexford administered, referred, and approved medical care for inmates at the Kilby Correctional Facility.

502.    At all relevant times, Wexford, as well as its agents and employees, acted under color of state law and within the course and scope of their employment.

503.    At all relevant times, Wexford had in effect official policies or longstanding practices and customs that condoned and fostered the unconstitutional conduct of JOHN DOES XV and XVI, and other agents and employees of Wexford and/or Kilby Correctional Facility, including:

      a.   Failing to identify prisoners, including Paul Ford, with serious mental-health needs and to classify their needs properly;

      b.   Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Paul Ford;

      c.   Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Paul Ford;

      d.   Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Paul Ford;

      e.   Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Paul Ford;

      f.   Placing seriously mentally ill prisoners, including Paul Ford, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Paul Ford, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Paul Ford.

504.    JOHN DOES XV and XVI and other agents and employees of Wexford were acting pursuant to these policies, practices, or customs.

505.    Wexford failed to properly train or supervise its agents and employees, including JOHN DOES XV and XVI, on the provision of needed psychological treatment to detainees.

506.    Defendant had actual and/or constructive knowledge of the deficient policies, practices and customs alleged above.  Despite having knowledge of the above, the Defendant condoned, tolerated and through its own actions or inactions thereby ratified such policies.

507.    As such, Wexford was deliberately indifferent and reckless with respect to the potential violation of constitutional rights of detainees, including Paul Ford.

508.    At all relevant times, Paul Ford had a right to be free from violations of his constitutional rights.

509.    The violation of Paul Ford's constitutional rights by JOHN DOES XV and XVI was the plainly obvious consequences of Defendant Wexford's failures.

510.    The acts or omissions of Defendant as described herein deprived Paul Ford of his constitutional rights and caused him other damages.

511.    As a proximate result of Defendant's unlawful conduct, Paul Ford suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

512.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

513.   In addition to compensatory, damages, Plaintiff is entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, JERI FORD respectfully requests that this Court enter judgment against Defendant Wexford, including awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 20: Wrongful Death
*(Jeri Ford vs. Defendants Dunn, Naglich, Bolling, John Doe VII-VIII and XV-XVI, and Wexford)*

514.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 289 above, as if fully restated herein.

515.   At all times, Defendants had a duty to refrain from acts and omissions which could cause the inmates of Kilby Correctional Facility unnecessary and unwarranted harm.

516.   The acts or omissions of Defendants as described herein caused Paul Ford's injuries, including his death.

517.   As a proximate result of Defendants' unlawful conduct, Paul Ford suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, physical injuries, extraordinary pain and suffering, and emotional distress.

WHEREFORE, JERI FORD respectfully requests that this Court enter judgment against Defendants, including awarding compensatory damages, punitive damages, and for any further relief this Court deems just.

Dated: February 24, 2020

Respectfully Submitted,

Joseph Mitchell McGuire (ASB 8317-S69M)
McGUIRE & ASSOCIATES, LLC
31 Clayton Street
Montgomery, AL 36104
(334) 517-1000 office
(334) 517-1327 fax
jmcguire@mandabusinesslaw.com


Nicolette A. Ward (*pro hac vice – to be filed*)
nward@rblaw.net
Antonio Romanucci (*pro hac vice – to be filed*)
aromanucci@rblaw.net
ROMANUCCI & BLANDIN, LLC
321 North Clark Street, Suite 900
Chicago, Illinois 60654
(312) 458-1000

*Attorneys for Plaintiffs*