IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BETTY HEAD, as Administrator of the Estate of Billy Lee Thornton, Jr., Deceased, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:20-CV-132-WKW [WO] |
| JEFFERSON DUNN, in his individual capacity, *et al.*, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2018 and 2019, four inmates were among those who committed suicide while in the custody of the Alabama Department of Corrections ("ADOC"): Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford. Plaintiffs Betty Head, Jeffery Rust, Theresa Holmes, and Jeri Ford are the administrators of their estates. The administrators assert two claims: a federal-law claim of violation of the decedents' Eighth Amendment rights (as enforced through 42 U.S.C. § 1983) and an Alabama state-law claim for wrongful death. Defendants include, among others, Jefferson Dunn, Ruth Naglich, Cynthia Stewart, Jimmy Patrick, and Leon Bolling (collectively, the "ADOC Defendants"), all sued only in their individual capacities.

The ADOC Defendants filed a motion to dismiss Plaintiffs' complaint.[1] (Doc. # 39.) For the reasons described below, the motion will be granted in part and denied in part.

## I. JURISDICTION AND VENUE

The court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental). Personal jurisdiction and venue are uncontested.

## II. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint against the legal standard articulated by Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). In considering a defendant's motion to dismiss, the court accepts the plaintiff's allegations as true, *see Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

---

[1] As noted, Plaintiffs' complaint alleges claims against several Defendants who were not included on the motion to dismiss. (*See* Doc. # 39, at 1.) This opinion considers only the claims against the Defendants who filed the motion.

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### III. BACKGROUND

The allegations in Plaintiffs' complaint, accepted as true for the purposes of resolving this motion, are as follows.

In 2018 and 2019, Billy Thornton, Ryan Rust, Matthew Holmes, and Paul Ford were among those incarcerated in ADOC facilities. At relevant times, Defendant Dunn served as ADOC's Commissioner; Defendant Naglich served as ADOC's Associate Commissioner for Health Services; and Defendants Stewart, Patrick, and Bolling served as wardens of various ADOC facilities. These officials served at a time when ADOC facilities were "chronically understaffed," when ADOC mental-health services were "deficient," and when ADOC was embroiled in litigation regarding its provision of mental-health care. (Doc. # 1, at 24, 8.) As evidence of these serious issues, Plaintiffs allege that:

3

- ADOC was substantially overcrowded, often housing 175% of the population its facilities were designed to hold (Doc. # 1, at 9);

- ADOC's mental-health provider was "severely understaffed" (Doc. # 1, at 9);

- ADOC's mental-health caseload increased by 25% from 2008 to 2016 (Doc. # 1, at 9);

- Inmates were routinely transferred between facilities, resulting in inadequate information and treatment at their new facility (Doc. # 1, at 14);

- Mental-health counselors' caseloads were "twice as high as what they should have been" (Doc. # 1, at 14);

- ADOC's correctional staffing also fell short of required levels (Doc. # 1, at 10), resulting in an inability to "check on isolated prisoners frequently enough to guarantee their safety" (Doc. # 1, at 11); and

- Throughout the relevant period, Naglich and Dunn considered, but failed to implement, policy changes that would have transferred some of ADOC's mental-health caseload, improved staffing or crowding levels, or otherwise altered its approach to mentally ill inmates (*see, e.g.*, Doc. # 1, at 10).

Together, Plaintiffs assert, these circumstances (and the many others alleged) often left inmates without needed mental-health care and, as a result, at a substantial risk of self-harm.

While in ADOC custody, Thornton, Rust, Holmes, and Ford committed suicide.  Their deaths involve several alleged characteristics of ADOC's suicide-prevention efforts, and for this reason they are recounted in detail here.

While incarcerated, Billy Thornton was observed trying to hang himself in 2017, repeatedly informed nurses of his suicidal intent, and eventually was placed on mental-health observation.  (Doc. # 1, at 31.)  He was not placed on acute suicide watch, and no suicide risk assessment was conducted.  In January 2018, he was released from mental-health observation; he was apparently seen by mental-health staff once from that point forward.  In February 2018, while housed in "segregation housing," he attempted suicide with a shoestring.  When the shoestring snapped, he fell, sustaining an injury that eventually led to his death.[2]  (Doc. # 1, at 32.)

Paul Ford committed suicide in January 2019.  (Doc. # 1, at 34.)  Previously, while incarcerated, he had attempted suicide by fire and by hanging.  After the second attempt, he was placed on suicide watch; two days later, he was placed in segregation.  (Doc. # 1, at 33.)  He saw no mental-health professionals, and his history of suicidal ideation was left off his next mental-health assessment.  (Doc. # 1, at 33.)  After another suicide attempt, Ford was placed, briefly, on suicide watch,

---

[2]    Thornton was incarcerated at both Holman Correctional Facility and Fountain Correctional Facility.  He died at Fountain Correctional Facility.

5

then released back into segregation.  (Doc. # 1, at 34.)  One month later, he was found hanging from his cell door.[3]

Matthew Holmes was incarcerated at Limestone Correctional Facility.  (Doc. # 1, at 36.)  Though a psychiatrist indicated that he had become suicidal, he was never placed on suicide watch; despite a "positive pre-placement screen," he never received a suicide risk assessment.  On February 13, 2019, Holmes's treatment plan indicated that he was "not making progress" toward his treatment plan goals; the next day, that same plan concluded that his goals were completed.  Despite various indicators of suicidal ideation, Holmes was released back to segregation.  Less than twelve hours later, he hung himself from an overhead light fixture.  (Doc. # 1, at 37.)

Ryan Rust arrived at Fountain Correctional Facility with a history of suicidal behavior, including swallowing a razor blade while in custody.  (Doc. # 1, at 34.)  In November 2018, he was placed on suicide watch.  After an attempted escape, Rust was placed in segregation housing.  Despite his apparent mental-health status, and despite his previous suicide attempts, Rust was not placed on suicide observation.  Less than two days after arriving in segregation, he was found hanging in his cell.  (Doc. # 1, at 35.)

---

[3] Ford was incarcerated at Holman Correctional Facility, Donaldson Correctional Facility, and Kilby Correctional Facility.  He died at Kilby Correctional Facility.

Plaintiffs Betty Head, Jeffery Rust, Theresa Holmes, and Jeri Ford are the administrators of the decedents' estates. They assert two claims: a federal-law claim of violation of the decedents' Eighth Amendment rights (as enforced through 42 U.S.C. § 1983) and an Alabama state-law claim for wrongful death. The ADOC Defendants filed a motion to dismiss Plaintiffs' complaint, which is now before the court. (Doc. # 39.)

## IV. DISCUSSION

### A. Federal-Law Claims

As to Plaintiffs' federal-law claims, the ADOC Defendants' motion to dismiss raises two challenges: first, that the complaint has failed to state a claim against the ADOC officials; and, second, that the officials are entitled to qualified immunity from those claims. (*See* Doc. # 39, at 2.) Defendants are only partially correct. As to Defendants Dunn and Naglich, Plaintiffs have stated a claim and, at this early stage, have met their burden to overcome qualified immunity.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (citation and internal quotation marks omitted). Officials receive this protection only if they establish that they were acting within their discretionary authority. *See Chesser v. Sparks*, 248

7

F.3d 1117, 1121 (11th Cir. 2001) (noting that "[q]ualified immunity protects government actors performing discretionary functions from being sued in their individual capacities").   When qualified immunity applies (that is, when a government actor is performing a discretionary function), a motion to dismiss a complaint on the grounds of qualified immunity will be granted if the "complaint fails to allege the violation of a clearly established constitutional right." *St. George v. Pinellas Cty.,* 285 F.3d 1334, 1337 (11th Cir. 2002) (citation and internal quotation marks omitted).  The burden for the latter showing lies with the plaintiff. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007) (internal citations omitted).

Here, it is undisputed that Defendants acted within their discretionary authority at the time of the relevant allegations.  (Doc. # 43, at 12 (conceding that ADOC Defendants were acting within their discretionary authority at the time of the violations at issue).)  Plaintiffs must therefore show that qualified immunity is not appropriate.  *See, e.g.*, *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988).

To overcome a public official's qualified-immunity defense, a plaintiff must make two showings.  "First, the plaintiff must establish that the defendant violated a constitutional right.  Then, the plaintiff must show that the violation was clearly established." *Griffin Indus., Inc.*, 496 F.3d at 1199 (internal citations omitted). Courts can consider these prongs in either order.  *See Pearson v. Callahan*, 555 U.S.

223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

To demonstrate that a right is "clearly established," a plaintiff may point to a "materially similar case," identify a "broader, clearly established principle," or show that "the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259–60 (11th Cir. 2018) (citation and internal quotation marks omitted); *see also Maddox v. Stephens*, 727 F.3d 1109, 1121 (11th Cir. 2013).  In considering whether a violation is "clearly established," relevant law "consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019).  A materially similar case "need not be directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *J W by & through Tammy Williams*, 904 F.3d at 1259 (citation and internal quotation marks omitted).

Defendants argue that Plaintiffs have failed to meet their burden on two fronts, asserting that no clearly established right was violated and that supervisory liability does not extend to render *Defendants* (and not only their subordinates) liable.  On

both issues, Defendants' arguments fail as to some, but not all, of the ADOC Defendants.

First, the court finds that, as relevant here, an inmate's constitutional right to mental-health care (including after that inmate has demonstrated a risk of suicide) is clearly established. As a general matter, inmate suicide and psychiatric care are long-standing issues, and Defendants' argument ignores precedent that has addressed them directly: The Eleventh Circuit has held that failures to provide minimal psychiatric care violate inmates' Eighth Amendment rights. *See, e.g.*, *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994) ("Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care and a right to be protected from self-inflicted injuries, including suicide." (citations omitted)); *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990) (holding that "reasonable persons in appellants' positions would have known that providing an inmate with inadequate psychiatric care could violate the inmate's eighth amendment right not to be subjected to cruel and unusual punishment"); *see also Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) ("Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration."). Defendants clearly had "fair and clear notice," *Vinyard*, 311 F.3d at 1355, that, in the context of

prisoner suicide, a showing that a "jail official displayed 'deliberate indifference' to the prisoner's taking of his own life" establishes a constitutional violation.  *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) (citation and internal quotation marks omitted).

Beyond these general precepts, the allegations of the instant case bear a striking resemblance to those in *Greason*, further evincing that the underlying right is clearly established.  *See Greason*, 891 F.2d at 834.  In *Greason*, as in the instant case, relevant officials "knew about the severe lack of staff members capable of providing psychiatric care to the inmates." *Id.* at 837.  *Greason* also documents insufficient units for "inmates with severe emotional problems." *Id*.  And, finally, *Greason* noted a failure to "take any action in response" to repeated complaints, *id.*, just as Plaintiffs allege here.  Though such specificity is not necessarily required, *Greason* puts any doubt to rest:  It is clearly established that an Eighth Amendment violation occurs when an inmate whom it was known had previously contemplated suicide is not seen frequently enough and is monitored insufficiently despite notable warning signs, resulting in his suicide.  *Id.* at 832 (describing "perfunctory" visits, evidence of suicidal ideation, and failures to oversee staff).

Indeed, *Greason* specifically dealt with *supervisory* liability in such a context, undermining defendants' efforts to argue the contrary.  *See id*. at 837.  This argument is discussed in greater detail below.

Defendants next argue that, even if the constitutional right *is* clearly established, the officials in question are not liable for the alleged violations because they are supervisors. It is well settled that "*respondeat superior* does not apply in § 1983 actions." *Averhart v. Warden*, 590 F. App'x 873, 874 (11th Cir. 2014); *see also Hardin v. Hayes*, 957 F.2d 845, 849 (11th Cir. 1992) ("Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability."). But the Eleventh Circuit has repeatedly held that § 1983 liability can nonetheless extend to supervisors: "Supervisory liability under § 1983 occurs when the supervisor personally participates in the alleged constitutional violation or *when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation*." *Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006) (citation and internal quotation marks omitted) (emphasis added); *see also Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). More specifically, that "causal connection" "may be established when: 1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference[4] to

---

[4] To demonstrate deliberate indifference in this context, an Eighth Amendment claimant must show "that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Importantly, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate . . . ." *Id.*

constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Valdes*, 450 F.3d at 1237 (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).   Notably, the Eleventh Circuit expressly has applied these standards to inadequate staffing in the context of mental-health care for incarcerated individuals, concluding that "[a] causal connection can be established when . . . the inmate's injuries result from the supervisor's failure to provide an adequate staff to administer medical or mental health care . . . ."[5] *Greason*, 891 F.2d at 837 n.18.

In summary, by the time the suicides described above occurred, the Eleventh Circuit had clearly established that supervisory prison officials are liable, and not shielded by qualified immunity, when a "custom or policy results in deliberate indifference to constitutional rights," *Valdes*, 450 F.3d at 1237—including when an

---

[5] Defendants seemingly suggest that *Greason* should be understood as a case regarding inadequate medical care, rather than one about structural conditions of prisons that made such care more likely.  (*See generally* Doc. # 47, at 6–7.)  Subsequent caselaw has indicated, at times, that *Greason* does not apply to all prison or jail contexts.  *See, e.g.*, *Belcher*, 30 F.3d at 1398 ("The clinical director and the warden of the mental health facility who were defendants in *Greason* were in positions materially different from Chief Anderson's.  On a daily basis their principal responsibility was to coordinate the provision of medical and psychiatric services to prisoners who were patients in a mental health facility.  By contrast, Chief Anderson's principal responsibility was to supervise the enforcement of laws and to arrest suspected violators in his community.").  But, among other things, *Belcher* considered an inmate who committed suicide while held in jail *at a police station* only a few hours after her arrest.  *See id.* at 1392.  The context at issue here is much more similar to *Greason*; the provision of mental-health care is a core requirement of running correctional facilities, inmate suicide is a consistent problem, and defendants were subjectively aware of repeated system-wide failures to provide psychiatric services.

"inmate's injuries result from the supervisor's failure to provide an adequate staff to administer medical or mental health care," *Greason*, 891 F.2d at 837 n.18; *see also id.* at 838—and when those officials reasonably knew, or should have known, that the custom or policy would result in a substantial risk of serious harm to inmates.

Plaintiffs satisfactorily have alleged facts to state this claim, but not against every ADOC Defendant.  Specifically, Plaintiffs' claims survive against Defendants Dunn and Naglich, but not against the other identified ADOC Defendants.  Dunn and Naglich, in their personal capacities, were both (allegedly) aware of meaningful failures to protect inmates' mental health:  Plaintiffs allege that Naglich admitted that the lack of a "constant-watch procedure" was a "serious problem" and that Dunn "personally reviewed suicide incident reports."[6]  (Doc. # 1, at 25; *see also* Doc. # 1, at 28 (describing Dunn's admission that he tracks suicide rates and incident reports).)  Both Naglich and Dunn reportedly knew that "patients in segregation . . . were not receiving treatment."  (Doc. # 1, at 26.)  According to the complaint, Naglich "admitted . . . that placing seriously mentally ill prisoners in segregation," which she knew to be a common practice, amounted to a "denial of minimal care," but the practice did not cease.  (Doc. # 1, at 27.)  Both officials were aware of a long history of deficient services and failures by contractors to meet their obligations, including

---

[6] As noted above, and as the motion-to-dismiss stage demands, Plaintiffs' allegations are accepted as true, *see Hishon*, 467 U.S. at 73, and all inferences are construed in Plaintiffs' favor, *see Duke*, 5 F.3d at 1402.

due to "staffing deficiencies and high caseloads."  (Doc. # 1, at 24.)  Still, despite their knowledge of these problems, Dunn and Naglich failed to implement new policies:  Dunn "never ordered his staff to take any concrete measures to correct the rate of suicide," and Naglich "made no effort to address the problem."  (Doc. # 1, at 28.)  As one example, Dunn apparently promised to implement a more robust constant-watch procedure—demonstrating an understanding of its importance—but failed to do so.  (Doc. # 1, at 26–27.)   These allegations, accepted as true at this stage, establish that Dunn and Naglich perpetuated policies that they knew fell far short of ADOC's constitutional obligations to inmates.[7]  Accordingly, here, like in *Greason*, "(1) the evidence could support a finding that the conduct reflected a deliberate indifference to Greason's eighth amendment right to adequate mental health care; (2) the officials should have known their conduct constituted deliberate indifference to a clearly established constitutional right; and (3) the conduct was causally connected to the violation of Greason's eighth amendment rights."  *Greason*, 891 F.2d at 840 (citation omitted).  Dunn's and Naglich's failures to act (and, ultimately, to prevent the suicides of Thornton, Rust, Holmes, and Ford) rise

---

[7]  To the extent that Plaintiffs rely on Defendants' admissions in other litigation, Dunn's and Naglich's "personal" selves are not legally bound, at least at this stage, by the admissions of their "official" counterparts in other cases.  *See generally Brooks v. Arthur*, 626 F.3d 194, 201 (4th Cir. 2010) ("[D]efendants in their official and individual capacities are not in privity with one another for the purposes of res judicata.") (citing Restatement (Second) of Judgments § 36(2) (1982)).  But their alleged statements can speak to, at this stage, whether they had fair notice of ADOC's problems.  The court reserves further consideration of the relevance of Dunn's and Naglich's prior testimony.

to the level of deliberate indifference toward the mental health of these inmates—and, therefore, to a violation of their constitutional rights.

In contrast, the complaint fails to point to specific policy action (or inaction) that can be attributed to the other ADOC Defendants.  (Indeed, while many of the allegations encompass all Defendants, large sections of the complaint discuss only Dunn and Naglich.  (*See, e.g.*, Doc. # 1, at 26–27.))  Allegations regarding Warden Cynthia Stewart's involvement, for instance, extend only to general assertions of knowledge regarding deficiencies occurring under her watch and her theoretical power to fix them.  (*See, e.g.*, Doc. # 1, at 29 (noting that Stewart "had the authority to order the provision of appropriate treatment").)  Unlike with Defendants above, the complaint fails to identify particular policy decisions that support a finding of deliberate indifference and, therefore, of the requisite causal connection. Accordingly, as to Defendants Stewart, Patrick, and Bolling, Plaintiffs' § 1983 claims are due to be dismissed.

With respect to Defendants Dunn and Naglich, two arguments merit further discussion.  First, Defendants point to caselaw wherein courts rejected conclusory allegations regarding the existence of a specific policy or custom that led to deliberate indifference.  *See, e.g.*, *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (finding insufficient a plaintiff's allegations of improper policy where she "[did] not describe any of the policies that were in place, the sort of policies that

should have been in place, or how those policies could have prevented [the constitutional violation]"); *see also Shook v. Dunn*, No. 2:18cv1048, 2020 WL 1492841, at *4 (M.D. Ala. Mar. 25, 2020) (Thompson, J.) ("[S]he has not alleged the basis for a finding that the policy even existed—that is, she has not identified in her allegations what documents, events, or circumstances reflect that the policy existed.  Nor are her conclusory allegations adequate to establish the existence of a custom—that is, she has not alleged a pattern of events or long-standing circumstances that would support the conclusion that such a custom existed.  Unsupported conclusory allegations of the existence of a policy or custom are insufficient to defeat a qualified-immunity defense.").  To be sure, a mere statement that some policy existed, without more, would fall far short of Plaintiffs' burden.  But the complaint at issue here provides specific evidence of policy decisions made by Defendants Dunn and Naglich—and, often, a resultant lack of policy change.  Plaintiffs' allegations provide specific evidence of the policies' existence and, where relevant, their flaws, which is essential to the survival of the underlying claims.

Defendants also argue that a supervisor's generalized knowledge of the risk of inmate suicide is insufficient to state a § 1983 claim.  (*See, e.g.*, Doc. # 47, at 5.)  The Eleventh Circuit has arguably indicated that a defendant must be aware of a particular risk *to an individual inmate* to be deliberately indifferent to a subsequent suicide.  *See, e.g.*, *Cook ex rel. Est. of Tessier*, 402 F.3d at 1117 ("Deliberate

17

indifference, in the jail suicide context, is not a question of the defendant's indifference to suicidal inmates or suicide indicators generally, but rather it is a question of whether a defendant was deliberately indifferent to *an individual's* mental condition and the likely consequences of that condition." (citation and internal quotation marks omitted)); *see also Keith v. Naglich*, No. 5:17-cv-01437, 2018 WL 513344, at *7 (N.D. Ala. Jan. 23, 2018) (Kallon, J.) ("[I]n the Eleventh Circuit, indifference to a class of suicidal inmates does not subject an official to supervisory liability for the suicide of a particular class member.").  But where a *custom or policy* is the basis for a § 1983 claim, the contemplated "causal connection" simply cannot require knowledge of *which particular inmates* will be harmed.  Indeed, the Supreme Court squarely has rejected this argument, *albeit* in the context of prison violence:

> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.  The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

*Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (citation and internal quotation marks omitted)).

Unsurprisingly, the Eleventh Circuit has held that a supervisor's repeated failure to respond to structural complaints, which in turn resulted in the risk of suicide to a group of inmates, can rise to the level of deliberate indifference.  *See Greason*, 891 F.2d at 837 ("[Dr.] Fodor also complained to Oliver [the clinical director of the Georgia Diagnostic and Classification Center] about the lack of an institutionalized mental health unit for inmates with severe emotional problems at the GDCC.   Again, Dr. Oliver failed to take any action in response to these complaints.  *A jury could easily construe this failure to act as deliberate indifference to the eighth amendment rights of GDCC inmates*." (alterations added) (emphasis added)); *id.* at 838 ("Oliver's failure to institute corrective procedures after the Waldrop incident could also be viewed as deliberate indifference.").  In light of this precedent, Plaintiffs' complaint need not establish that Dunn and Naglich knew *which inmates* would be at risk of suicide in light of ADOC's apparently deficient policies and customs.

Accordingly, Plaintiffs' claims survive on a motion to dismiss, but only as to Defendants Dunn and Naglich.  Plaintiffs' claims as to the other ADOC Defendants are due to be dismissed.

## B.  <u>State-Law Claims</u>

Plaintiffs also allege wrongful death claims under Alabama law.  Defendants argue that the complaint fails to state a wrongful death claim, that the ADOC

officials are entitled to immunity from the wrongful death claims, and that, to the extent that the court dismisses Plaintiffs' federal-law claims, it should decline to exercise supplemental jurisdiction over the state-law claims. Plaintiffs have failed to state a wrongful death claim against the ADOC Defendants, and accordingly these claims are due to be dismissed.[8]

Plaintiffs assert a wrongful death claim against the ADOC Defendants. *See* Ala. Code § 6-5-410. Pursuant to Alabama's wrongful death statute, a personal representative may bring suit "for the wrongful act, omission, or negligence of any person, persons, or corporation, his or her or their servants or agents, whereby the death of the testator or intestate was caused, provided the testator or intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death." *Id.* at 410(a). "For a wrongful death claim, a plaintiff must produce evidence as to the existence of the basic elements of a tort claim, such as duty, breach, causation, and damages." *Hobson v. Bibb Cty. Comm'n*, 2008 WL 11424253, at *4 (N.D. Ala. Mar. 5, 2008) (Coogler, J.).

"Under Alabama law, suicide generally functions as an efficient intervening cause which serves to break all causal connections between the alleged wrongful or negligent acts and the death at issue." *Vinson v. Clarke Cty., Ala.*, 10 F. Supp. 2d

---

[8] Because Plaintiffs' complaint does not state a wrongful death claim and therefore Plaintiffs' state-law claims are due to be dismissed, Defendants' other arguments are not considered.

1282, 1303 (S.D. Ala. 1998) (Vollmer, J.).  But a defendant can be liable for a suicide where "the relationship between a decedent and a defendant is such that we expect the defendant to take affirmative steps to protect the decedent from deliberate and self-destructive injury at the decedent's own hand," *Gilmore v. Shell Oil Co.*, 613 So. 2d 1272, 1278 (Ala. 1993)—including in "custodial situation[s]" like "hospitals or prisons," *id.* at 1276 (citation and internal quotation marks).

Even in this circumstance, however, a defendant is not always liable for an inmate's suicide.  Most notably, "[t]he controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether *the defendants* reasonably should have anticipated that the deceased would attempt to harm himself." *Popham v. City of Talladega*, 582 So. 2d 541, 543 (Ala. 1991) (emphasis added); *see also Bryant v. Carpenter*, No. 1180843, 2020 WL 5582231, at *3 (Ala. Sept. 18, 2020).  That is, as applied by the Alabama Supreme Court in the context of inmate suicide, the relevant statute seemingly does not contemplate the causal chain that would be required here.  Rather, it requires knowledge, on the part of Defendants themselves, regarding a risk to a specific inmate.  *See, e.g.*, *Popham*, 582 So. 2d at 543; *see also Smith v. King*, 615 So. 2d 69, 73 (Ala. 1993) (applying the same test regarding whether "*these defendants* either should have or could have foreseen" an inmate's suicide (emphasis added)).

21

Plaintiffs have not alleged sufficient facts to state a claim under this standard. The facts alleged by Plaintiffs do suggest that *other* ADOC employees may have known enough to surmise that Thornton, Ford, Rust, and Holmes were at risk of self-harm.   For instance, Plaintiffs allege that Mr. Ford "cut his wrist" while in segregation but that, only eight days later, a risk assessment concluded that he had no history of suicidal ideation.  (Doc. # 1, at 34.)  Similarly, though Mr. Rust had apparently "swallowed a razor blade," his pre-placement screenings did not recommend him for an urgent referral.  (Doc. # 1, at 35.)  These facts indicate that *someone* knew enough to recognize a substantial risk to these individuals—and perhaps to prevent their tragic deaths.  But Plaintiffs have not alleged facts that suffice to link this specific knowledge to the ADOC Defendants, particularly in their individual capacities.  This dooms Plaintiffs' state-law claims, which are therefore due to be dismissed.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' Motion to Dismiss (Doc. # 39) is GRANTED IN PART and DENIED IN PART:

(1)   The motion is GRANTED as to Plaintiffs' federal-law law claims (as enforced through 42 U.S.C. § 1983) against Defendants Cynthia Stewart, Jimmy Patrick, and Leon Bolling, and those claims are DISMISSED with prejudice;

(2)     The motion is DENIED as to Plaintiffs' federal-law claims (as enforced through § 1983) against Defendants Jefferson Dunn and Ruth Naglich; and

(3)     The motion is GRANTED as to Plaintiffs' state-law claims for wrongful death against Defendants Jefferson Dunn, Ruth Naglich, Cynthia Stewart, Jimmy Patrick, and Leon Bolling, and those claims are DISMISSED with prejudice.

DONE this 19th day of May, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE